```
                    IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF HAWAII


HAWAII MOTORSPORTS              )   CIV. NO. 09-304 SOM/BMK
INVESTMENT, INC., a Hawaii      )
corporation, and HAWAII         )   ORDER GRANTING DEFENDANT'S
MOTORSPORTS CENTER LIMITED      )   MOTION FOR SUMMARY JUDGMENT
PARTNERS,                       )   ON SECOND CAUSE OF ACTION
                                )
             Plaintiffs,        )
                                )
     vs.                        )
                                )
CLAYTON GROUP SERVICES, INC.,   )
formerly known as CLAYTON       )
ENVIRONMENTAL ENGINEERING and   )
CLAYTON ENVIRONMENTAL           )
CONSULTANTS, INC., now known    )
as BUREAU VERITAS NORTH         )
AMERICA, INC., a Delaware       )
corporation doing business in   )
Hawaii; DOES 1-10,              )
                                )
             Defendants.        )
_____ )
```

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ON SECOND CAUSE OF ACTION

I.      INTRODUCTION.

This case concerns a complex sale of property in Kapolei, on the Island of Oahu. Plaintiff Hawaii Motorsports Center Limited Partners ("HMC"), and its general partner, Plaintiff Hawaii Motorsports Investment, Inc. ("HMI"), now seek damages relating to the sale of HMC's interest in the property to Irongate Wilshire LLC ("Irongate"). Plaintiffs say that Defendant Bureau Veritas North America, Inc. ("BV"), harmed them by preparing an inaccurate environmental report pursuant to a

contract BV had with Irongate.  BV moves for summary judgment on HMC's claim that it was an intended beneficiary of BV's contract with Irongate and that BV breached that contract.  This court grants BV's motion.

II.     BACKGROUND.

The Estate of James Campbell owned the Hawaii Raceway Park in Kapolei, Hawaii.  Michael T. Oakland Decl. ¶ 3, attached to HMC's Concise Statement.  Beginning in 1988, Campbell Estate leased the park to Hawaii Motorsports Center Limited Partners or its predecessor(s).  Id. ¶ 5.

In 1999, HMC began to consider purchasing the property from Campbell Estate.  Id. ¶ 6.  HMC's plan was to have the property rezoned, subdivided into individual lots, and then sold by individual lot.  Enomoto Decl. ¶ 6.

On May 18, 2005, HMC formed an Acquisition Agreement with Campbell Estate stating, "The Estate and HMC have now agreed upon the terms and conditions under which HMC shall acquire the fee simple interest in and to the Estate Property."  Ex. D at 1, attached to BV's Motion.  HMC was to pay about $13 million to Campbell Estate.  Id.  HMC was to begin by depositing $200,000 dollars with escrow, and Campbell Estate was then to deliver title documents to HMC.  HMC then had 90 days to "study" the documents.  Id. at 8.  During this "study period" HMC had the absolute right to terminate the Agreement.  Id.  On or before the

last day of the study period, HMC was to either give notice that it was terminating the Agreement (in which event its deposit would be returned), or accept the Agreement.  At the end of the study period, assuming HMC accepted the property, HMC was to deposit with escrow an irrevocable standby letter of credit from a Hawaii bank approved by Campbell Estate.  Id. at 6.

The Acquisition Agreement states, "The Estate's overriding intention in entering into this Agreement is to effect a tax-deferred exchange of the Estate Property with the same tax consequences and entitlements as would apply to an exchange under the laws, rules and regulations in effect as of the date of this Agreement."  Id. at 16.  Additionally, although time was of the essence, the Estate had "until July 31, 2006 within which to convey the Estate Property to HMC."  Id. at 9.  Finally, "HMC acknowledge[d] that prior to execution of this Agreement, the principals of HMC had the opportunity and did conduct tests and inspections . . . including non-invasive environmental and soil studies, . .  and that HMC accepted the condition of the Estate Property upon execution of this agreement."  Id. at 4.

HMC's final deadline for obtaining a letter of credit worked out to be October 28, 2005.  Ex. 5, attached to HMC's Concise Statement.

HMC sought financing so that it could obtain that letter of credit.  Oakland Decl. ¶ 11.  In that connection, HMC

contacted Irongate Wilshire LLC in early October 2005.  Enomoto Decl. ¶ 9.  On October 7, 2005, Irongate offered to buy the property for $22 million.  Ex. 2, attached to HMC's Concise Statement.  The offer stated that Irongate was to have 25 days to conduct due diligence, and that Irongate would be "responsible for all due diligence related costs and expenses."  Id. at 2.  In return, HMC was to assign its rights in the property to Irongate.

After Irongate had sent its offer to HMC, HMC and Irongate realized that HMC could not assign its rights to Irongate without Campbell Estate's permission.  The Acquisition Agreement between Campbell Estate and HMC provided that HMC could assign its rights only to an "affiliate of Oakland/Enomoto" or to "an Affiliate of HMC."[1]  Ex. D at 13, attached to BV's Motion; Exs. 3 & 4, attached to HMC's Concise Statement.  As Irongate was not affiliated with HMC or Oakland/Enomoto, HMC could not assign its rights to Irongate without an amendment to the Acquisition Agreement.

Irongate sent HMC a new offer before October 19, 2005. Ex. 5, attached to HMC's Concise Statement.  Under this offer,

---

[1] An "affiliate of Oakland/Enomoto" was defined as an entity controlled by Michael Oakland (the President of HMI) and/or Tom Enomoto (an HMI shareholder and partial owner of HMC), and in which Oakland and/or Enomoto, individually or together, had a beneficial interest of 50% or more.  Id. at 2.  An "Affiliate of HMC" was defined as any corporation wholly owned by any of the present partners of HMC or any corporation that controlled, or was controlled by or was under common control with, HMC.  Id.

4

HMC was to seek amendment of the Acquisition Agreement to allow HMC to assign its rights to Irongate and to allow a letter of credit to issue from a non-Hawaii bank.  Id. at 2.  Additionally, Irongate offered to buy the property for the new price of $20 million, ("$13,188,147 to Campbell as consideration for the fee simple to the Property and $7,100,000 to HMC as consideration for the leasehold and improvements").  Id.  The fee simple purchase was to be funded by a letter of credit, and the leasehold was to be purchased by Irongate after Campbell Estate had deeded the property to Irongate.  Id.  The agreement also provided that HMC would assist Irongate with its due diligence review, which was to include, "among other tasks, providing all reports, studies, title information and the like received by HMC."  Id.

While HMC was reviewing Irongate's offer, Irongate contacted BV about preparing a Phase I environmental site assessment of the property.  On October 18, 2005, BV sent Irongate a proposal for such work, addressing it to "Irongate AZREP BW LLC."  Ex. A, attached to BV's Motion.  The proposal stated that BV would start work "upon written authorization to proceed."  Id. at 3.  BV promised to provide oral findings by October 27, 2005, if Irongate accepted BV's proposal by October 19, 2005.  The scope and cost of the project were "based on the information provided by Irongate Azrep BW LLP."  Id. at 4.  The proposal stated that BV "understand[s] that Irongate Azrep BW LLC

will use [BV's] report to assess environmental conditions and potential environmental liabilities, if any, associated with the property." Id. at 1.  Finally, BV was to perform services in accordance with the "Terms and Conditions" previously negotiated in September 2005 between Irongate and BV.  Id. at 4.  The Terms and Conditions do not name Irongate, instead referring to BV's customer as "client."  Ex. J, attached to BV's Motion.

Irongate told BV to start work.  Ford Decl. ¶ 5; Ex. 20 at 110, attached to HMC's Concise Statement.  Within days of starting its assessment, BV orally reported to Irongate that the property had serious environmental problems.  Ford Tr. at 119-121, 127.  By October 21, 2005, Irongate had been informed by BV that it would be costly to fix the environmental problems.  Id.; Ex. 6, attached to HMC's Concise Statement.

In the meantime, HMC was asking Campbell Estate to modify the Acquisition Agreement so that HMC could assign its rights to Irongate.  Oakland Decl. ¶ 17; Ex. 7, attached to HMC's Concise Statement.  By October 21, 2005, Campbell Estate had responded that amendment was not an option, because Campbell Estate's tax-exempt status depended on selling the property to its lessee, HMC.

Irongate and HMC then agreed to form a joint venture to purchase the property.  On October 26, 2005, Irongate and HMC agreed that Irongate would buy the property for $13,200,000, "in

6

the form of a letter of credit ("LC") to be paid to Campbell at the expiration of the due diligence period under the Acquisition Agreement."  Ex. 8, attached to HMC's Concise Statement. Additionally, Irongate would make four payments to HMC of $250,000 each, subject to certain conditions, plus 10% of the net earnings.  Id.  Irongate was to pay the first $250,000 at the time the letter of credit to Campbell Estate was posted, the second $250,000 when the deed was transferred, the third $250,000 on completion of rezoning, and the final $250,000 after some lots had been sold and the debt paid off.  Id.  The final $250,000 payment was to be held in escrow as an environmental reserve for any remediation.  Id.  In return for Irongate's payments, HMC was to assign its interest in the property to the joint venture.  Id. at 2.

On October 27, 2005, Irongate asked Campbell Estate for an extension of the time to get a letter of credit.  Ex. 9, attached to HMC's Concise Statement.  It is unclear when a letter of credit issued.

On October 28, 2005, HMC Irongate Raceway Investors LLC was formed (later renamed HMC Irongate Hawaii Raceway Investors LLC).  Ex. 10, attached to HMC's Concise Statement.  The same day, Irongate Raceway Investors LLC, an Irongate special purpose entity, was also formed (later renamed to Irongate Hawaii Raceway Investors LLC).  Id.

HMC Irongate Hawaii Raceway Investors LLC's operating agreement, dated October 28, 2005, explained that HMC Irongate Hawaii Raceway Investors LLC was composed of HMC (51% membership interest with no initial contributions) and Irongate Hawaii Raceway Investors LLC (49% membership interest and $100 initial contribution).  Ex. 12, attached to HMC's Concise Statement. Irongate Hawaii Raceway Investors LLC was the managing member of the HMC Irongate Hawaii Raceway Investors LLC.  Id. at 2.

On November 1, 2005, Irongate Hawaii Raceway Investors LLC (an Irongate Wilshire LLC special entity), entered into an agreement with HMC to buy the Campbell Estate property.  HMC then assigned its rights in the Acquisition Agreement to HMC Irongate Hawaii Raceway Investors LLC.  Ex. 11, attached to HMC's Concise Statement.  HMC Irongate Hawaii Raceway Investors LLC was to make four payments to HMC of $250,00 each, subject to certain conditions.  Id.  The agreement provided that, immediately after closing, HMC's ownership interest in the new company would decrease to 10%.  Id. at 10.

On November 4, 2005, BV emailed a copy of its Phase I report to Joshua Crane of Irongate, addressed to "Irongate AZREP BW, LLC."  Ex. B, attached to BV's Motion.  On November 16, 2005, BV emailed a proposal for a Phase II environmental assessment to "HMC Irongate Raceway Investors LLC c/o Mr. Joshua Crane, Member."  Ex. 13, attached to HMC's Concise Statement.

On December 8, 2005, BV sent Irongate AZREP BW LLC an invoice for BV's Phase I work. Ex. 14, attached to HMC's Concise Statement. HMC Irongate Hawaii Raceway Investors LLC paid for the work. Ex. 15, attached to HMC's Concise Statement.

On July 14, 2006, HMC Irongate Hawaii Raceway Investors LLC received title to the property.

In June 2009, HMC filed suit in Hawaii state court. BV removed the case to federal court, then moved to dismiss HMC's Complaint. This court dismissed three of HMC's four claims and gave HMC leave to amend its Complaint. HMC filed an Amended Complaint asserting, among other things, that BV had breached its contract with Irongate. HMC brings this claim on the theory that it was an intended beneficiary of that contract. HMC says that Irongate paid HMC $7 million less than previously contemplated because of inaccuracies in BV's Phase I environmental report. Before the court is BV's motion for summary judgment on this claim.

III.  STANDARD OF REVIEW.

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually

unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party "must set forth specific

facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir.2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256,(1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

IV.     ANALYSIS.

HMC contends that it is an intended beneficiary of a BV-Irongate contract pursuant to which BV was to prepare an environmental report. In saying this, HMC relies on its status as a member of the joint venture that HMC says intended to rely on the report. BV counters that it prepared the report only for Irongate. This court finds no evidence that HMC is an intended beneficiary of the BV-Irongate contract.

Under Hawaii law, a third-party beneficiary is "one for whose benefit a promise is made in a contract but who is not a party to the contract." Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 85 Haw. 300, 309, 944 P.2d 97, 106 (Haw. Ct. App. 1997). A party claiming to be an intended third-party beneficiary bears the burden of proving that status. Ass'n of Apartment Owners of Newton Meadows v. Venture 15, Inc., 115 Haw.

232, 271, 167 P.3d 225, 264 (2007) (citations omitted).  Even if the parties are aware that a contract is being performed for the benefit of others, "it is not enough that the parties know, expect, or even intend that such people may benefit or that they are referred to in the contract."  Id. at 271, 167 P.3d at 264.  Instead, there must be evidence that the contracting parties intended to confer a direct benefit on that third party.  Id.

    Urging this court to deny BV's summary judgment motion, HMC says that there is a factual dispute about who the parties to the contract were.  BV addressed its proposal and communications to "Irongate AZREP BW LLC," even though all parties (including HMC) agree that the entity BV dealt with was actually Irongate Wilshire LLC.  HMC says that BV's inaccurately addressed communications give rise to a factual dispute concerning who BV intended its report to benefit.  HMC is unpersuasive.

    BV's contract proposal is addressed to "Irongate AZREP BW LLC," and BV sent communications and bills to that entity.[2] BV says Irongate told BV that Irongate AZREP BW LLC would be the entity that would buy the Campbell Estate property.  Ford Decl. ¶ 4.  For its part, Irongate says that BV incorrectly and

---

  [2]"BW" means Beach Walk, and "AZREP" means Ackermin Zwrin Real Estate Partners.  Crane tr. at 20.  Irongate AZREP BW LLP was the entity involved with the Trump Tower in Waikiki.  Ex. E at 21, attached to BV's Motion.  BV had worked with Irongate Wilshire LLC in May 2005 on a job relating to the development of Trump Towers.  Ford Decl. ¶ 2.

mistakenly addressed its proposal and communications to Irongate AZREP BW LLC instead of to Irongate Wilshire LLC, and that Irongate failed to tell BV about the mistake. Crane tr. at 54-55.

Even if BV was confused about the name of the relevant Irongate entity, this confusion does not create a factual dispute precluding summary judgment. The alleged confusion does not manifest anyone's intent that BV's report benefit HMC.

HMC argues that: (1) Irongate Hawaii Raceway Investors LLC was Irongate Wilshire's special entity for buying the property; (2) Irongate Hawaii Raceway Investors LLC operated as the managing agent of HMC Irongate Hawaii Raceway Investors LLC, the HMC-Irongate joint venture; (3) HMC was a part owner of the joint venture; and (4) the BV-Irongate contract entered into before either Irongate Hawaii Raceway Investors LLC or HMC Irongate Hawaii Raceway Investors LLC was formed was intended to benefit HMC. The progression of HMC's argument is untenable.

The BV-Irongate contract does not expressly state that BV was to perform services for the HMC-Irongate joint venture, much less for HMC. BV's Vice President did not learn about the joint venture until after HMC filed the present lawsuit. Ford Decl. ¶ 11. BV's Senior Vice President states that, at the time the contract was formed, "Irongate Wilshire, LLC and Irongate AZREP BW LLC were the only known Irongate entities." Vora Decl.

13

¶ 5.   Irongate's main representative knew of no one who told BV about the joint venture, or about the new entities being formed. Crane tr. at 57.

HMC says that BV should have known that Irongate would form a joint venture to buy the property, given Irongate's known history of forming such joint ventures.  In that regard, HMC points to language in the October 26, 2005, letter of intent that states that Irongate Wilshire LLC "and/or its affiliated entity" would form a joint venture with HMC.  Ex. 8, attached to HMC's Concise Statement.  But there is no evidence that BV knew that Irongate would form a joint venture with HMC, the entity attempting to sell its property interest to Irongate.  In any event, HMC has no ownership interest in Irongate Hawaii Raceway Investors LLC, Irongate's special purpose "affiliated entity" formed for the sale.  And that entity was not formed until after the Irongate-BV contract had been entered into and after BV had reported to Irongate that the property had environmental problems.

At the earliest, Irongate and HMC decided to form a joint venture on October 21, 2005.  Before that date, the parties' agreements and offers stated that HMC would assign its rights to Irongate.  Ex. 5, attached to HMC's Concise Statement (October 19, 2005, agreement explaining that HMC would seek amendment of the Agreement).  Only when HMC realized that

14

Campbell Estate would not amend the Acquisition Agreement, and that HMC therefore could not assign its interest to Irongate, did Irongate and HMC discuss possibly forming a joint venture. See Ex. 4, attached to HMC's Concise Statement (email dated October 16, 2005, noting that HMC might need to ask permission from Campbell Estate); Ex. 7, attached to HMC's Concise Statement (email dated October 21, 2005, stating that Campbell Estate would not give permission). By October 21, 2005, BV and Irongate had already entered into their contract, and BV had already partially performed on that agreement.

At the hearing on the present motion, HMC stated that the operative time for determining whether HMC was an intended beneficiary of the Irongate-BV contract was the time that contract was entered into. Nothing in the record indicates that at that time Irongate or BV even knew, much less intended, that HMC and Irongate would create a joint venture together.

HMC argues that because BV sent the HMC-Irongate joint venture its Phase II report proposal almost a month after its initial proposal for the Phase I environmental report, BV must have known that the Phase I report was intended for HMC. HMC's conclusion simply does not follow. BV's second proposal was sent to a company that had not existed at the time BV made its first proposal. It is therefore nonsensical to work backwards to a conclusion that BV must have intended that its first proposal

benefit HMC based on HMC's role in a yet-to-be-created entity.

HMC argues next that because HMC Irongate Hawaii Raceway Investors LLC paid the bill for BV's Phase I environmental report in December 2005, BV and Irongate must have intended that BV's services benefit HMC.  However, mere payment of a bill, three months after the services were rendered, does not show that at the time the contract was formed the parties intended to benefit HMC.

HMC finally contends that the HMC-Irongate joint venture accepted, adopted, and ratified BV's services when it paid for those services.  HMC says that the joint venture had a right to sue if BV's services were faulty, because the joint venture paid for those services.  Therefore, HMC argues, HMC, based on its involvement in the joint venture, may also sue.  This is not the case.

HMC completely disregards the separate existences of the legal entities created for the sale.  HMC seeks to be treated as if it is HMC Irongate Hawaii Raceway Investors LLC.  HMC presents no law establishing that this court should view HMC as the joint venture.

Second, HMC appears to be claiming that Irongate entered into its contract with BV on behalf of the not-yet-created joint venture.  "A corporation may be bound on an agreement made in its name by its promoters prior to incorporation where the corporation subsequently adopts the

16

agreement by express ratification or by acceptance of benefits related to it." In re Vortex Fishing Sys., 277 F.3d 1057, 1070 (9th Cir. 2002) (quotations omitted). The problem with HMC's claim is that there is no evidence that the BV-Irongate contract was made "in the name" of the joint venture.

Finally, even if the joint venture ultimately accepted and ratified the Irongate-BV contract, that does not mean that BV intended to benefit HMC at the time BV entered into the contract. Nor would any ratification by the joint venture give rise to a right on HMC's part to challenge BV's services. Indeed, if BV's services were faulty, HMC should have urged the joint venture to withhold payment to BV and instead insisted then that BV had breached the contract. There is no evidence HMC did that, and the joint venture apparently paid BV without complaint.

V.    CONCLUSION.

This court grants BV's motion for summary judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii June 29, 2010



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Hawaii Motorsports Investment v. Clayton Group Services, 09cv304; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON SECOND CAUSE OF ACTION