BRONSTER HOSHIBATA
A Law Corporation
MARGERY S. BRONSTER      #4750
REX Y. FUJICHAKU      #7198
MARGUERITE S. NOZAKI      #8599
1003 Bishop Street, Suite 2300
Honolulu, Hawai'i  96813
Telephone:  (808) 524-5644
Facsimile:  (808) 599-1881

Attorneys for Plaintiffs
HAWAII MOTORSPORTS INVESTMENT, INC. and
HAWAII MOTORSPORTS CENTER LIMITED PARTNERS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HAWAII MOTORSPORTS INVESTMENT, INC., a Hawaii corporation, and HAWAII MOTORSPORTS CENTER LIMITED PARTNERS, <br><br> Plaintiffs, <br><br> v. <br><br> CLAYTON GROUP SERVICES, INC., formerly known as CLAYTON ENVIRONMENTAL ENGINEERING and CLAYTON ENVIRONMENTAL CONSULTANTS, INC.,  now known as BUREAU VERITAS NORTH AMERICA, INC., a Delaware corporation doing business in Hawaii; DOES 1-10, <br><br> Defendants. | Civ. No. 09-304 SOM/BMK <br> (Contract) <br><br> PLAINTIFFS' ***MEMORANDUM IN OPPOSITION*** TO DEFENDANT BUREAU VERITAS NORTH AMERICA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO **INJURIOUS FALSEHOOD/SLANDER OF TITLE/TRADE LIBEL** [DKT. NO. 115], FILED ON MAY 31, 2010, AND ***COUNTER-MOTION*** FOR PARTIAL SUMMARY JUDGMENT REGARDING THE SAME; CERTIFICATE OF SERVICE <br><br> <u>Hearing</u>: <br> Date:  August 9, 2010 <br> Time:  9:00 a.m. <br> Judge:  Hon. Susan O. Mollway |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ............................................................................... ii - iii

I. INTRODUCTION ........................................................................................ 1

II. BACKGROUND ......................................................................................... 2

III. LEGAL STANDARD .............................................................................. 13

IV. ARGUMENT ............................................................................................ 15

    A. BV'S FALSE REPRESENTATIONS ABOUT THE ENVIRONMENTAL CONDITION OF THE PROPERTY INJURED HMC ...................................................................... 15

        1. BV Published In Oral and Written Form Disparaging Statements Regarding the Condition of the Property. .............. 17

        2. BV's Statements Were Made With Reckless Disregard for the Truth and Induced Irongate to Reduce Its Purchase Price........ 18

        3. HMC Suffered Special Damages When Irongate Reduced Its Purchase Price, Imposed Conditions to Payment, and Additional Expenses Were Incurred to Refute BV's Findings............................................................................. 26

V. CONCLUSION ......................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

Auvil v. CBS "60 Minutes", 67 F.3d 816 (1995)....................................................... 16

B&B Inv. Group v. Gitler, 581 N.W.2d 17, 20 (Mich.App. 1998).................... 16, 19

Barkhorn v. Adlib Assocs., Inc., 203 F.Supp. 121, 122 (D. Haw. 1962) .......... 17, 18

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548,
     91 L.Ed.2d 265 (1986)......................................................................... 14

California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003) ................................ 14

Dodds v. American Broadcasting Co., 145 F.3d 1053, 1061 (9th Cir. 1998). ........ 20

Eastwood v. National Enquirer, Inc., 123 F.3d 1249 (9th Cir. 1997) ................ 19-20

Ellis v. Crockett, 51 Haw. 45, 50, 51 Haw. 86, 451 P.2d 814, 819 (1969) ............. 26

Harte-Hanks Communications, Inc. v. Connaughton,
     491 U.S. 657, 688 (1989) ............................................................... 19, 20

Hawaiian Ins. & Guar. Co., Ltd. v. Blair, Ltd., 6 Haw.App. 447,
     454-55, 726 P.2d 1310, 1315 (1986) ............................................. 16, 17

Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006) ................. 14

New York Times Co. v. Sullivan, 376 U.S. 254 (1964),......................................... 19

Nissan Fire & Marine Ins. Co. v. Fritz Cos.,
     210 F.3d 1099, 1102 (9th Cir. 2000) ................................................... 13

Runnells v. Okamoto, 56 Haw. 1, 5, 525 P.2d 1125, 1129 (1974) ......................... 20

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,
     809 F.2d 626, 630 (9th Cir. 1987)....................................................... 14

## **RULES**

Fed. R. Civ. P. 56(c) .................................................................................................. 13

## **OTHER**

Restatement (Second) of Torts (1977). .................................... 1, 15, 16, 17, 19, 20, 27

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
BUREAU VERITAS NORTH AMERICA, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO INJURIOUS FALSEHOOD/
SLANDER OF TITLE/TRADE LIBEL [DKT NO. 115], FILED ON
MAY 31, 2010, AND COUNTER-MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING THE SAME**

## I.    INTRODUCTION

Plaintiffs Hawaii Motorsports Investment, Inc. ("HMI") and Hawaii
Motorsports Center Limited Partners ("HMC") (collectively "Plaintiffs") submit
their opposition to Bureau Veritas North America, Inc.'s ("BV" or "Defendant")
Motion for Partial Summary Judgment As To Injurious Falsehood/Slander of
Title/Trade Libel ("Injurious Falsehood") [Dkt No. 115], Filed On May 31, 2010
("Motion"), and Counter-motion for Partial Summary Judgment regarding the
same.

Plaintiffs have satisfied the elements of injurious falsehood under Hawaiʻi
law, which follows the Restatement (Second) of Torts (1977).  Defendant
published false, disparaging statements of the subject Property's environmental
condition to Irongate Wilshire LLC ("Irongate Wilshire") and Plaintiffs, which
caused actual damages to Plaintiffs.  While the transaction contemplated eventually
was consummated, Plaintiffs' property rights in the process had been improperly
eviscerated by BV's conduct.  BV must be held liable for the loss incurred by
Plaintiffs.

1

## II.   **BACKGROUND**[1]

The Estate of James Campbell ("Campbell Estate") was the fee simple owner of an approximately 65.817-acre parcel in Kapolei, Hawai'i on the island of Oahu known as the Hawaii Raceway Park ("Property").  Affidavit of Michael Oakland ("Oakland Aff.") ¶ 3.

On or about May 18, 2005, Plaintiff HMC, by and through its general partner, Plaintiff HMI, executed an agreement with the Estate for the purchase of the fee simple interest in the Property ("Acquisition Agreement").  Id. ¶ 8; Ex. A to Motion.  The acquisition price was $13,188,147.00, to be consummated with a letter of credit issued within 90 days of the execution date of the Acquisition Agreement, unless extended.  Oakland Aff. ¶ 9; Ex. A to Motion  at 1, 5-6.

Upon execution of the Acquisition Agreement, HMC sought out third party financing or partnerships in order to assist in funding the acquisition price for the fee interest to the Property.  Id. ¶ 11.  On or about July 11, 2005, HMC and Lokahi Ventures, LLC ("Lokahi") executed a sale and leaseback agreement wherein Lokahi agreed to pay a total purchase price of $20,770,000 for the property.  See **Exhibit 1** at 14.  The transaction with Lokahi ultimately was not consummated

---

[1] Plaintiffs incorporate by reference the background facts stated in Plaintiffs' Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment on Second Cause of Action (Breach of Contract) of Plaintiffs' First Amended Complaint, Filed April 15, 2010 ("Contract MPSJ") [Dkt No. 95] filed June 7, 2010.

when certain investors in Lokahi questioned whether the racetrack on the property could be closed without significant opposition by the racers.  See Oakland Aff. ¶ 12.  Lokahi expressly told HMC that the reason the transaction was not consummated was because of the investor's concerns about closure of the track and *not* based on any environmental concerns.  Id.

In early October 2005, HMC made contact with Irongate Wilshire LLC ("Irongate Wilshire").  Id. ¶ 13.  The "core members" of Irongate Wilshire's real estate acquisition team at the time were Adam Fisher, Jason Grosfeld, Casey Federman, and Joshua Crane.  Transcript of deposition of Joshua Crane ("Crane Tr.") at 23:10-24:4 (attached as **Exhibit 11**).

On or about October 19, 2005, HMC and Irongate Wilshire entered into a binding letter agreement under which Irongate Wilshire or its designee agreed to purchase the Property for "an overall purchase price of $20,300,000."  Oakland Aff. ¶ 14; Letter Agreement dated Oct. 19, 2005 (attached as **Exhibit 2**).

> This letter shall serve as a <u>binding agreement</u> for Hawaii Motorsports center, LP ("HMC") to sell and for Irongate Wilshire, LLC or its designee ("Irongate") to purchase the approximately 65.817 acre property known as the Hawaii Raceway Park, located at Kapolei, Oahu, Hawaii and further identified as TMK 1-9-1-75:44 & 50 ("Property").  . . .
>
> Irongate agrees to an overall purchase price of $20,300,000, which will be paid in two parts: $13,200,000 to Campbell as consideration for the fee simple to the Property ("Fee") and $7,100,000 to HMC as consideration for the leasehold and improvements ("Leasehold").  The Fee will be funded by a Letter of Credit, and the Leasehold will be

3

> purchased for cash upon the execution of definitive documentation between Irongate and HMC. . . .

Id. at I00914 (emphasis added).[2]  Although HMC's compensation was described in terms for the leasehold, HMC would in actuality be paid for its interest under the Acquisition Agreement.  Oakland Aff. ¶ 14.

In the Letter Agreement, HMC also agreed to assist Irongate Wilshire with the due diligence process.  See Ex. 2 at I00915.  The due diligence included obtaining a Phase I environmental site assessment report ("ESA") which would be used by the parties in part to secure third-party financing for the transaction, refine the value of the Property, and provide innocent landowner defenses to the purchaser of the Property.  Oakland Aff. ¶ 15.  Enomoto and Oakland understood that Irongate Wilshire was hiring Defendant to perform the Phase I on behalf of and for the benefit of both Irongate Wilshire (or its specially created entity for the acquisition) and HMC and its affiliates.  Id. ¶16; Affidavit of Thomas Enomoto ("Enomoto Aff.") ¶ 13.

On or about October 18, 2005, Joshua Crane of Irongate Wilshire contacted Defendant's agent, Kirit Vora, to do the Phase I assessment for the Property.  See Crane Tr. at 99-100, 107-08; Affidavit of Daniel P. Ford dated May 17, 2010, attached to Motion ("Ford Aff.") ¶¶ 9-11.  Previously, in mid-September 2005,

Vora, on behalf of Defendant, negotiated with Crane a set of standard "Terms and Conditions" which would apply to "all contracts for environmental services that Clayton Group Services, Inc. or BV would later render to Irongate Wilshire LLC, or any of the special purpose entities it established for each of its real estate transactions."  See Affidavit of Kirit Vora attached to Contract MPSJ ¶ 2 ("Vora Aff.") (emphasis added) (attached as **Exhibit 15**).  Thus Defendant knew that, at the time it negotiated the contract for the Phase I ESA for the Property, any subsequent contract for Irongate Wilshire may be for Irongate Wilshire, or on behalf of "any of the special purpose entities [Irongate Wilshire] established for each of its real estate transactions."  Id.

On October 18, 2005, Defendant prepared a proposal no. PR-85ES06.204 dated October 18, 2005 ("Proposal") to conduct a Phase I environmental site assessment ("ESA") for the Property.  See Ford Aff. ¶ 14; Ex. B to Motion. Although the Proposal was addressed to Joshua Crane and Irongate AZREP, Crane testified that Defendant's identification of Irongate AZREP as the "client" on the Proposal was a "misprint," and should have been to Irongate Wilshire, LLC or some other special purpose entity created by Irongate Wilshire.  See Crane Tr. at 54-55, 99-100, 107-08.

---

[2] Attached as Exhibit A to the First Amended Complaint is an earlier version of the letter agreement, signed by Irongate Wilshire, which was superceded by the Letter Agreement attached hereto as Exhibit 2.  Oakland Aff. ¶ 17.

Defendant's agent, Scott Simmons, conducted a site inspection of the Property unaccompanied on October 19, 2005.  See Ex. C to Motion at 3 ("Mr. Scott Simmons . . . conducted the site walkthrough portion of the assessment on October 19, 2005, unaccompanied.").  Simmons did not receive permission from the Campbell Estate or Plaintiffs to inspect the Property, nor did he perform the site inspection with Mike Oakland, who was intimately familiar with the environmental conditions of the Property.  Oakland Aff. ¶ 19; Enomoto Aff. ¶ 15. Moreover, prior to the site inspection, Simmons had not reviewed documents possessed by HMC or Campbell Estate regarding the environmental conditions of the Property, or reviewed the file for the Property at the state Department of Health Office of Hazard Evaluation and Emergency Response (HEER), which is in charge of enforcing compliance with the state's environmental laws.  Oakland Aff. ¶ 20; Transcript of Deposition of Scott Simmons (April 26, 2010) ("Simmons 4/26 Tr.") at 106:7-107:13 (attached as **Exhibit 14**).

After the site inspection, Simmons reported his findings and conclusions from his unaccompanied site visit and his deficient records review to his supervisor, Dan Ford.  Simmons 4/26 Tr. at 146:4-147:17; Transcript of Deposition of Daniel Ford ("Ford Tr.") at 114, 123:8-124:20 (attached as **Exhibit 12**).  In testifying about his conversation with Simmons, Ford stated that Simmons identified leaking drums, soil stains, bilge water and sandblast grit, among other

things, as Recognized Environmental Concerns ("REC") purportedly existing on the property during his site visit on October 19, 2005, in addition to a previous report of the property by Levine Fricke.  Ford Tr. at 113:24-118:6.

On or about October 21, 2005, based on Simmons' report, Ford orally told Crane about Defendant's conclusion that serious environmental conditions existed on the Property, and that potential remediation costs could be up to $4 million.

Q.  Okay.  How did you arrive at the three- to four-million-dollar figure?

A.  It's been five years and, again, as I talked about before, these are very -- it was very preliminary numbers so certain assumptions would have had to have been made.  Our cost estimating process on something like this would be estimating volumes of materials that would have to go out of there multiplied by certain tonnages.  We knew that there was bilge water there.  We knew that there was certain -- we hadn't done the Phase I so we hadn't confirmed any of it, but, you know, it's a very preliminary worst case so it would have been based on volumes. We also would have had an assumption on whether groundwater had been impacted or not.  At the time we didn't know.

Q.  So what in your mind is the definition of worst case?

A.  Worst case is a large quantity of material would have to be hauled out of there.  Some of it might be hazardous waste, may have to be shipped to the mainland; PCB waste, groundwater's contaminated, may have to run an active pumping system there, or a long-term monitoring plan that could go on for, you know, many years. And then off site migration, that's if it goes off site, your neighbors might want to recover damages from that.

Q.  Based upon what you had learned from Mr. Simmons up to that point, did the RECs that he found support the worst case scenario of $4 million?

A.   Again, this is very preliminary information. There was lots of RECs out there.  You know, from the photographs and from what we saw at the site it was certainly something that had enough unknowns that would, you know, potentially warrant those costs, so. . .

Q.   So the more the unknowns become known, you can get a better number; is that right?

A.   (Witness nods head.)  Yes.

Ford Tr. at 120:3-128:21.

Crane was struck by Defendant's $4 million estimate of the potential remediation cost: "The only thing I remember from the conversation is the $4 million number."  Crane Tr. at 127:11-13 (emphasis added).

Q.   Now, do you recall the content of that conversation?

A.   Yes, I do.

Q.   What did that Clayton person tell you?

A.   So my request from him is to bracket the costs.  I wanted to know what was the likely cost, and if -- if things go poorly what could be a bad cost and time.  So that's what we spoke about.

Q.   What specific costs did you have in mind?

A.   So, my memory -- and it could be faulty -- but for some reason I remember as an outside number $4 million being thrown around.

Q.   And when you say as an "outside number," what does that mean?

A.   Sorry.  As a number when things went poorly $4 million or in that range, you know, not 12 million, not 27,000 but somewhere in the range of $4 million.

Q.    So let me try to understand what you said. Did you ask the Clayton person whether 4 million was the maximum exposure for remediation costs that could happen?

A.    No, I asked them to give me a maximum, and they said around 4 million.

Q.    I see.  Okay.  All right.  And did they say why it was 4 million?

A.    That wouldn't have been -- I don't know enough about environmental stuff to really appreciate that this cost "X" and this cost "Y," so I wanted them to kind of bracket a number.  I won't have gone into that detail, but if I did, I don't remember.

Crane Tr. at 112:7-113:12 (emphasis added).

Crane relied on BV's expertise on the potential remediation costs:

THE WITNESS:  Hold on.  I want to elaborate to make sure I was clear, if I wasn't before.

MR. FUJICHAKU:  Please.

THE WITNESS:  I don't know what it cost to remove a piece of soil that was impaired or to fix ground water.  So I'm not an environmental expert.  I'm relying on them to tell me it cost "X."  But I can't put you up the train and say this costs -- I can't give you the components of that 4 million, I just knew it was 4 mill.

Q.    I understand and I'm not asking you to do that today.  I was just asking you whether you believe you got the figures and the time lines from Clayton?

[Objection]

THE WITNESS:  Yes.  I did get them from Clayton.

Crane Tr. at 114:6-:22 (emphasis added).

Crane admitted that the environmental issues identified by Defendant "absolutely" affected the dramatic decrease in the ultimate purchase price for the property:

> Q.   And did the environmental issues that came up during the due diligence process affect that $19 million [purchase price] number?
>
> [Objection]
>
> THE WITNESS:  <u>So it affected the eventual number, let me say, absolutely.</u>
>
> Q.   Okay.  It was absolutely a factor in moving down from 19 to 13?
>
> [Objection]
>
> THE WITNESS:  Again, I am going to try to be clear with my words. <u>It was a factor in arriving at the eventual price.</u>

Crane Tr. at 117:10-24 (emphasis added).

The same day, Crane emailed Defendant's remediation figures to Fisher, Grosfeld and Federman.  <u>See</u> emails between J. Crane, A. Fisher, J. Grosfeld, and C. Federman dated Oct. 21, 2005 (attached as **Exhibit 8**).  Fisher replied: "Sounds like you guys need to make clear to Enomoto 2nite that this is HIS RISK."  <u>Id.</u>

On or about October 25, 2005, Fisher informed Enomoto about Defendant's erroneous finding about the environmental condition of the Property and Defendant's extraordinary $ 4 million remediation figure.  Enomoto Aff. ¶ 16.  As a result of Defendant's adverse and erroneous conclusions, Irongate Wilshire reduced the purchase price for the Property significantly and insisted on holding

10

back an environmental reserve fund to cover the potential remediation costs.  Id. ¶ 17.  The terms of the new arrangement were memorialized in a letter agreement dated October 26, 2005.  Oakland Aff. ¶ 25; Letter Agreement dated Oct. 26, 2005 (attached as **Exhibit 3**).   The Letter Agreement states that "HMC and Irongate shall herein be collectively referred to as 'Purchaser' of the Property."  Id. at 1.

On October 31, 2005, Ford emails Crane the remediation figures Ford had orally told Crane on October 21, 2005, repeating the $4 million remediation estimate.  See **Exhibit 9**; Ford Tr. at 133:10-134:22.

On or about November 4, 2005, Defendant emailed Crane a copy of the Phase I report.  Ford Aff. ¶ 19; Ex. C to Motion.  The Phase I report acknowledges that, "This assessment was requested in association with an acquisition of the subject property."  Ex. C to Motion at 1.

On or about November 7, 2005, HMC and Irongate Raceway executed the Operating Agreement for the JV.  Enomoto Aff. ¶ 20; Oakland Aff. ¶ 26; LLC Agreement of HMC Irongate Hawaii Raceway Investors LLC dated Oct. 28 2005 (attached as **Exhibit 4**).  On or about November 7, 2005, HMC, Oakland, Enomoto, and Irongate Raceway also executed a purchase agreement whereby HMC assigned its rights under the Acquisition Agreement to the JV.  Enomoto Aff. ¶ 21; Oakland Aff. ¶ 27; Agreement dated as of Nov. 1, 2005 ("Purchase Agreement") (attached as **Exhibit 5**).  As reflected in the Purchase Agreement,

11

HMC would receive $250,000 on satisfaction of a third party lien ("Lokahi lien") placed on the Property. Id. at HMC-000013.  A second $250,000 would have been received at closing, but was held back to fund an "environmental reserve." Id. HMC would receive a further $500,000 only if rezoning was successful and net sale proceeds from the sale of the industrial lots were realized. Id. at HMC-000014.  HMC's membership interest was also to be reduced from 51%, as provided in the LLC Agreement, to 10% at closing of the sale. Id. at HMC-000024.

On November 16, 2005, Defendant emailed to Joshua Crane Defendant's proposal for a Phase II investigation of the Property. See email from L. Fraser to J. Crane dated Nov. 16, 2005, attaching Defendant's Phase II Proposal dated Nov. 16, 2005 ("Phase II Proposal") (attached as **Exhibit 6**).  The Phase II Proposal was addressed not to Irongate AZREP, but to "HMC Irongate Hawaii Raceway Investors LLC c/o Mr. Joshua Crane, Member," and was apparently signed by Dan Ford and Scott Simmons. Id. at 1, 8.  The proposal total was over $95,200, with addition work ranging from $150,000 to $300,000. Id. at 6, 7.  Crane emailed the Phase II Proposal to Tom Enomoto on November 22, 2005.  Enomoto Aff. ¶ 22.

On or about March 10, 2006, Casey Federman sent to Tom Enomoto a copy of the financial statements of the JV which reflected that the JV paid for BV's Phase I ESA.  Letter from C. Federman to T. Enomoto dated Mar. 10, 2006,

enclosing "HMC Irongate Hawaii Raceway Investors LLC Financial Statements, December 31, 2005" (attached as **Exhibit 7**); Enomoto Aff. ¶ 23.

On or about July 14, 2006, the JV acquired title to the Property.  Oakland Aff. ¶28.  Plaintiffs ultimately were paid $550,000.00 by Irongate Raceway for their rights under the Acquisition Agreement.  Id. ¶ 29.

In the end, the remediation exposure estimates provided to Irongate Wilshire by BV turned out to be grossly inflated.  Id. ¶ 30.  The total amount charged for the Phase I and II ESA performed *and* attorneys' fees *and* remediation amounted to approximately $170,000, with approximately only $30,000 of the total going towards "remediation", which in fact, only involved the federally-mandated closure of the cesspools.  Id.  Apart from the cesspools, none of the costs went towards remediating any of the claimed RECs in BV's Phase I ESA.  Id.

## III.   LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), the moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Because one of the principal

purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Accordingly, summary judgment will only be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.

When the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); see also Miller, 454 F.3d at 987 (a material fact is one that could affect the outcome of the suit under the governing substantive law).  On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Id. at 988 (quotations and brackets omitted).

The following discussion serves as both an opposition to Defendant's Motion and support for Plaintiffs' Countermotion for Partial Summary Judgment.

14

As such, the legal standard iterated above is applicable to both Defendant's Motion and Plaintiffs' Countermotion.

## IV.   ARGUMENT

### A.   BV'S FALSE REPRESENTATIONS ABOUT THE ENVIRONMENTAL CONDITION OF THE PROPERTY INJURED HMC.

A cause of action for injurious falsehood includes claims for slander of title and trade libel.  A person who publishes a false statement is liable for the pecuniary losses of another if "(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."  Restatement (Second) Torts § 623A (1977).  The elements for slander of title and trade libel claims run parallel to each other, with the only distinction being that slander of title involves the publication of a false statement which disparages another's *property rights* in land, chattels or intangible things, while trade libel disparages the *quality* of another's property.

"Trade libel or disparagement means the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.  At a minimum, a

15

claim for trade libel or disparagement requires (1) a publication; (2) which induces others not to deal with plaintiff; and (3) special damages." Hawaiian Ins. & Guar. Co., Ltd. v. Blair, Ltd., 6 Haw.App. 447, 454-55, 726 P.2d 1310, 1315 (1986) (citations, footnote and quotation marks omitted), quoting Restatement (Second) of Torts § 626 (1977). "Trade libel or disparagement falls in the category of torts designated as 'injurious falsehood' rather than 'defamation.'" Id. at 454 n.9, 726 P.2d at 1315 n.9, citing Restatement (Second) of Torts §§ 623A et seq. (1977).

"To establish slander of title at common law, a plaintiff must show falsity, malice, and special damages, i.e., that the defendant maliciously published false statements that disparaged a plaintiff's right in property, causing special damages." B&B Inv. Group v. Gitler, 581 N.W.2d 17, 20 (Mich.App. 1998).

Hawai'i cases discussing injurious falsehood claims are scant, but like the Ninth Circuit, Hawai'i courts follow the Restatement (Second) of Torts. Id.; see also Auvil v. CBS "60 Minutes", 67 F.3d 816 (1995) (discussing the Restatement in its analysis on product disparagement). The Restatement (Second) of Torts § 626 (1977) provides:

> The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of matter disparaging the *quality* of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.

(Emphasis added).

As will be discussed below, Plaintiffs have satisfied all three elements to prove their trade libel and slander of title claims.  With reckless disregard of its truth or falsity, BV published matter derogatory to the quality and title of the Property, which played a material and substantial part in inducing Irongate Wilshire's reduction of the purchase price and restructuring of its deal with HMC.

       1.     BV Published In Oral and Written Form Disparaging Statements Regarding the Condition of the Property.

"Publication of an injurious falsehood is its communication intentionally or by a negligent act to someone other than the person whose interest is affected." Hawaiian Ins., 6 Haw.App. at 455 n.10, 726 P.2d at 1315 n.10, quoting Restatement (Second) of Torts § 630 (1977).  It is enough that the injurious falsehood is negligently communicated; the communication need not be intentional.  See Restatement (Second) of Torts § 630 cmt. a (1977).  In the context of slander of title claims, the disparagement need not be something as tangible and direct as the filing of a mortgage or lien, but may be in the form of "conduct that is intended to assert or is reasonably understood as an assertion of a disparaging statement." Id.  Slander of title "includes both spoken and written words." Barkhorn v. Adlib Assocs., Inc., 203 F.Supp. 121, 122 (D. Haw. 1962) (citation omitted).

In this case, BV conducted an incomplete and hurried investigation of the Property, and reported erroneous findings of nine purported Recognized Environmental Concerns ("REC") and an unsupported remediation cost estimate to Irongate Wilshire.  <u>See</u> Ex. C to Motion; Ford Tr. at 120:3-128:21; Crane Tr. at 112:7-113:12.  BV thus communicated its statement orally and in written form, both of which constitute "publication".  <u>Barkhorn</u>, 203 F.Supp. at 122.

BV disputes that the Phase I report caused the damages suffered because the actual written report was not issued until November 4, 2005, and Irongate Wilshire and Plaintiffs agreed to modify their purchase arrangement on October 26, 2005.  <u>See</u> Memorandum in Support of Motion ("Mem.") at 24.  However, the testimony of Joshua Crane, one of the Irongate Wilshire principals, shows that it was the oral report by Defendant's agents on October 21, 2005, which caused the injury.  <u>See</u> Crane Tr. at 117:10-24 (stating environmental concerns "absolutely" affected ultimate purchase price).  Defendant's argument that its wrongful actions did not cause the pecuniary losses sustained by Plaintiffs is refuted by the evidence.

      2.      BV's Statements Were Made With Reckless Disregard for the <u>Truth and Induced Irongate to Reduce Its Purchase Price.</u>

According to the Restatement, a "principal basis for liability for injurious falsehood has been that the publisher knew that the statement was false or that he did not have the basis of knowledge or belief professed by his assertion." Restatement (Second) of Torts § 623A cmt. d (1977).  Under the Restatement, a

18

statement is disparaging "it is understood to cast doubt upon the quality of another's land, chattels or intangible things, or upon the existence or extent of his property in them, and (a) the publisher intends the statement to cast the doubt, or (b) the recipient's understanding of it as casting the doubt was reasonable." Id. § 629.  The Restatement recognizes that, unlike defamation, the disparaging statement may take the form of "an expression of opinion or a statement of fact." Id. cmt. b.

Under common law, a plaintiff asserting a slander of title action (but not necessary an injurious falsehood action) needs to show malice.  See, e.g., B&B Inv. Group, 581 N.W.2d at 20.  Historically, the title of "actual malice" was first given by the court in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), which involved defamation actions brought against public officials.  Id.  More recent cases, however, have been "less inclined" to apply the element termed "actual malice" and have instead posed the requirement in terms of knowledge of falsity or reckless disregard as to truth or falsity.  Id.

Ninth Circuit courts have been guided in their analysis by the Supreme Court's reasoning in Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989), which elaborated on the standard and proof required to show that a defendant acted with reckless disregard.  See, e.g., Eastwood v. National

Enquirer, Inc., 123 F.3d 1249 (9th Cir. 1997).  In Harte-Hanks, the court

established the following standard:

> A "reckless disregard" for the truth ... requires more than a departure
> from reasonably prudent conduct. There must be sufficient evidence
> to permit the conclusion that the defendant in fact entertained serious
> doubts as to the truth of his publication. The standard is a subjective
> one-there must be sufficient evidence to permit the conclusion that the
> defendant actually had a high degree of awareness of probable falsity.
> As a result, failure to investigate before publishing, even when a
> reasonably prudent person would have done so, is not sufficient to
> establish reckless disregard. In a case such as this involving the
> reporting of a third party's allegations, recklessness may be found
> where there are obvious reasons to doubt the veracity of the informant
> or the accuracy of his reports.

491 U.S. at 688 (internal quotations and citations omitted).

While the existence or absence of malice is generally a question for the jury,

this Court, by applying the standard set forth in Harte-Hanks and the Restatement,

should find that the evidence supports a finding that BV had obvious reasons to

doubt the veracity of its findings, but engaged in "purposeful avoidance of the

truth[.]"  See Runnells v. Okamoto, 56 Haw. 1, 5, 525 P.2d 1125, 1129 (1974);

Dodds v. American Broadcasting Co., 145 F.3d 1053, 1061 (9th Cir. 1998).

In this case, BV put on its blinders to discovering the true environmental

condition of the Property, exaggerated its visual observations of the Property, and

intentionally communicated this slanted version of its findings to Irongate, in order

to secure an expensive and costly Phase II assignment.  Under the ASTM E 1527-

00 standard, in order to obtain the most complete information about the property

20

being investigated, there are certain individuals who should be interviewed, including the key site manager and owner of the property, prior to the site visit. See ASTM E 1527 §§ 5.3, 9.5.1, 9.5.3, 9.9, 8.4, 8.4.4, 9.8 (attached as **Exhibit 10**). Without these very important interviews, the environmental consultant is left to speculate based on his own casual observations and outdated information.

The time limitations imposed on BV by Irongate Wilshire, coupled with an unauthorized site investigation, proved fatal to BV's ability to prepare a thorough and well-researched Phase I ESA which conformed to industry standards. Consequently, the purported conditions at the property which BV's agent, Scott Simmons, determined to constitute Recognized Environmental Concerns ("REC") lack factual underpinnings.  Simmons did not receive permission from the Campbell Estate or HMC to inspect the Property on October 19, 2005, nor was Simmons accompanied by Mike Oakland during the site inspection, despite the fact that Oakland is intimately familiar with the environmental conditions of the Property.  See Oakland Aff. ¶ 19; Enomoto Aff. ¶ 15. Because Simmons did not speak to anyone familiar with the proper before or during his site inspection, his conclusions turned out to be erroneous.

Moreover, as reflected in the Phase I report itself, Simmons heavily relied on an earlier 1995 report done by Levine Fricke ("Levine Fricke") of the property. See Ex. C to Motion at 22-25.  Therefore, many of the RECs identified by

21

Simmons were either resolved or corrected many years before his inspection. Oakland Aff. ¶ 21. Oakland himself arranged the Levine Fricke consultant's site inspection in 1995. Id. ¶ 22. Thus he is familiar with the environmental concerns described in the 1995 Levine Fricke report, the condition of the Property in 1995, *as well as what has been done since then to resolve or correct the concerns*. Id.

For example:

a. Simmons stated that waste oil containers and determined that there was a possible release of hazardous substances. In reality, most containers were empty or were used as trash receptacles.

b. Simmons noted possible releases of heavy metals and strong acid from stored batteries. In reality, the batteries are collected and disposed of timely and properly, oftentimes taken to the battery recycler and recycled.

c. Simmons stated that abandoned vehicles on the Property represent a REC. In reality, a prior tenant contracted with the City & County of Honolulu to tow abandoned vehicles from the city streets, and hold them until they are sold at auction. The vehicles not sold at auction were dismantled and sold as scrap at another property. This operation ceased years before Mr. Simmons's site inspection on October 19, 2005.

d. Simmons relies heavily upon the 1995 Levine Fricke report in identifying the RECs. In particular, Simmons mentions 500 truck loads of soil imported from Mililani Mauka, and concludes that there is a concern for pesticides and herbicides as Mililani Mauka was previously agricultural land. In reality, Oakland personally arranged for the soil to be transported to the Property. He was careful not to truck soils from areas which may be contaminated by pesticides and herbicides. Moreover, any contaminants would have been dissipated through aeration by the mere fact of loading, hauling, and unloading the soil from one location to another.

22

e.   Simmons used the Levine Fricke report which stated that the Property contained a paint booth, as basis for one of the RECs. There is no paint booth on the Property.

f.   Simmons notes the past release of oil sprayed at the Property as a REC.  A private investigation supervised by Levine Fricke was conducted and it was determined that there was no significant, reportable amount of hazardous substances on the Property.  Simmons also notes the past release of cleaned bilge water, or Gamlen Cold Wash, on the Property.  The spraying of oil and bilge water were resolved and do not present an environmental concern.

g.   Any anonymous complaints to the State of Hawaii Department of Health agencies were investigated and found to have no basis.

Oakland Aff. ¶ 21.  Had Oakland accompanied Simmons during his site inspection, he would have been able to provide Simmons with current information and correct or clarify many of the misconceptions and factual errors contained in his summary. Id. ¶ 22.  Simmons admits that if he had done the site inspection with Oakland or some knowledgeable about the actual conditions of the property, he would have been able understand the property better.  See Transcript of Deposition of Scott (April 16, 2010) ("Simmons 4/16 Tr.") at 244:3-12 (attached as **Exhibit 13**). Simmons admits that he did not interview Enomoto about the Property prior to his site inspection.  Id. at 161:23-162:5.

The lack of proper investigation eventually led to false statements in the Phase I report.  For instance, Simmons admits that a representation that Oakland

23

and Enomoto were interviewed at the time of the site inspection is not true:

> Q.    First sentence [of the Phase I ESA] says, "At the time of the site inspection, Mr. Tom Enomoto and Mr. Mike Oakland, of Hawaii Motor Speedway, were interviewed for current and historical knowledge of the subject property."  That's not correct, is it?
>
> A.    (Perusing exhibit).  It's not.  It's a little bit unclear from that statement.

Simmons 4/16 Tr. at 243: 14-21.  Simmons obtained bits and pieces of information to compile the Phase I ESA.  Simmons then proceeded to prepare a report based on the hodgepodge of information he was able to gather in the short time frame given, and misrepresented the true condition of the Subject Property.

Because the factual gathering for the ESA was defective, the estimates BV communicated to Irongate Wilshire of the likely ranges of costs to remediate the environmental conditions on the Property were unsubstantiated as they were based on Simmons's flawed assessment of the property.  In an email dated October 21, 2005, after speaking with Defendant's agents, Joshua Crane of Irongate Wilshire emailed to his colleagues the best case scenario for environmental exposure of $200,000 to $400,000, and the worst case scenario of $3 million to $4 million.  See Exhibit 8.  According to Crane, "The only thing I remember from the conversation is the $4 million number."  Crane Tr. at 127:11-13.

The exposure estimates provided to Irongate by BV turned out to be grossly inflated.  The total amount charged for the Phase I and II ESAs *and* attorneys' fees

*and* remediation amounted to approximately $170,000, with approximately only $30,000 of the total going towards "remediation", which in fact, only involved the federally-mandated closure of the cesspools.  See Oakland Aff. ¶ 30.   Apart from the cesspools, none of the costs went towards remediating any of the claimed RECs in BV's Phase I ESA.  Id.  The vast difference between the figures BV estimated and what it actually ended up costing to remediate the Property is a strong indicator of BV's haphazard assessment due to time pressures and incomplete information, and negligent reporting of the same.

Plaintiffs' expert, Douglas Hazelwood, prepared expert reports dated March 15, 2010, and April 30, 2010, in which he analyzed BV's Phase I ESA and provided his opinions on the report's compliance or non-compliance with the relevant industry standards.  See Declaration of Douglas Hazelwood dated July 16, 2010 ("Hazelwood Decl.") ¶ 10 and Exs. DH-2 & DH-3 thereto.  According to Mr. Hazelwood, in October 2005, ASTM E 1527-00 was the most appropriate industry standard for Phase I ESAs to qualify a commercial property for protection under the innocent landowner defense provided by CERCLA.  Id. ¶¶ 13, 14.  Indeed, ASTM E 1527-00 was the standard by which BV claimed to perform the Phase I ESA for the property.  See Ex. C to Motion at 1.

Mr. Hazelwood opines that BV failed to meet the requirements and standards of the ASTM E 1527-00 in performing the Phase I ESA.  Hazelwood

25

Decl. at ¶¶ 15-22.  Mr. Hazelwood opines that of the nine (9) RECs identified by

BV, he had serious concerns involving six (6) RECs.  Id.  Amongst BV's

shortcomings, Mr. Hazelwood in his April 30, 2010 report criticized the fact that:

> 1.    Several of the RECs were based entirely on the 1995 Levine Fricke report with no supporting or follow-up investigation;
>
> 2.    The Phase I ESA was completely devoid of disclosure of BV's deviations from the ASTM standard; and
>
> 3.    BV recommended expensive Phase II sampling and analysis for the RECs based solely on the Levine Fricke report when it should have conducted the appropriate records reviews and interviews.

See Ex. 3 to Hazelwood Decl. at 13.  Moreover, Mr. Hazelwood opines that Ford's

remediation cost estimates to Crane of up to $ 4 million were "entirely lacking in

credulity or reliability and should be considered a guess."  Hazelwood Decl. ¶ 26.

> 3.    HMC Suffered Special Damages When Irongate Reduced Its Purchase Price, Imposed Conditions to Payment, and Additional Expenses Were Incurred to Refute BV's Findings.

"[S]pecial damages are considered to be the natural but not the necessary

result of an alleged wrong and are such that they do not follow by implication of

law merely upon proof of a wrong.  In other words, special damages do not arise

solely from the wrongful act itself, but rather depend on the circumstances peculiar

to the infliction of each particular injury."  Ellis v. Crockett, 51 Haw. 45, 50, 51

Haw. 86, 451 P.2d 814, 819 (1969) (citation omitted).

In the context of a claim of injurious falsehood, special damages include pecuniary loss. According to the Restatement, pecuniary loss is restricted to the following:

> (a)  the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and
>
> (b)  the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.

Restatement (Second) of Torts § 633 (1977).

The loss need not be the result of a lost sale, but may also arise from a diminution in price. This occurs when a purchaser relies on a disparaging statement that results in the price paid to be less than that which he had previously offered or than the value of the thing disparaged. See id. cmt. f. In such a case, the party suffering the pecuniary loss may recover the difference between the amount of the original offer and the price realized, or the difference between the value of the thing in question and the price realized. Id.

In this case, BV's communication to Irongate Wilshire of BV's purported findings induced Irongate Wilshire to make the sudden drop in its offer for the Property. HMC and Irongate Wilshire entered into a binding letter agreement dated October 19, 2005 in which HMC would receive a cash payment of $7,100,000 outright after transfer of the deed and title to Irongate Wilshire or its

27

designee.  See Exhibit 2.  This was the original deal negotiated between Irongate Wilshire and HMC, which was partially based on the amount other parties were willing to pay for the Subject Property.  For example, prior to Irongate's entering the picture, Lokahi Ventures, LLC was willing to pay a total purchase price of $20,770,000 for the rights to own the fee simple interest in the Subject Property, which would have resulted in $7,581,853 to HMC.  See Exhibit 1 at 14.

On October 21, 2005, Dan Ford of BV informed Joshua Crane of Irongate Wilshire that there were serious environmental conditions on the Property and that potential remediation could cost up to $4 million.  Ford Tr. at 127.  The same day, alarmed by the prospect of remediation costs reaching into the millions, Crane immediately transmitted the remediation figures to his colleagues for discussion and plan of action.  See Exhibit 8.  Just days after being informed of the serious environmental conditions on the Property, Irongate Wilshire relayed the information to HMC as its basis to reduce the purchase price of the Property and holding back an environmental reserve fund to cover the potential remediation costs.  See Enomoto Aff. ¶ 17.  Irongate Wilshire also wanted to make sure that HMC (specifically, Tom Enomoto) understand that the remediation is "HIS RISK".  See Exhibit 8.

After Irongate Wilshire learned of BV's erroneous findings, HMC was pressured into accepting an agreement in which it would receive substantially less,

28

in staggered payments, and with certain other conditions imposed, instead of a cash payment of $7,100,000 as provided by the October 19, 2005 binding letter of intent.  As reflected in the Purchase Agreement, HMC would receive the following as compensation for its rights under the Acquisition Agreement: $250,000 would be received on satisfaction of the "Lokahi lien" placed on the Property.  See Ex. 5 at HMC-000013.  A second $250,000 would have been received at closing, but was held back to fund an "environmental reserve."  Id.  HMC would receive a further $500,000 only if rezoning was successful and net sale proceeds from the sale of the industrial lots were realized.  Id. at HMC-000014.  HMC's membership interest was also reduced from 51%, as provided in the JV Operating Agreement, to 10%.  Id. at HMC-000024.

Plaintiffs ultimately were paid $550,000.00 by Irongate Raceway for their rights.  See Oakland Aff. ¶ 29.  Therefore, based on what Plaintiffs would have received from the October 19, 2005 agreement ($7.1 million) minus what Plaintiffs actually were paid ($550,000), Plaintiffs' special damages are at least $6,550,000.

Moreover, HMC's payout from the transaction was diminished by the additional expenses incurred which were necessitated to refute the findings in BV's Phase I report.  The total amount charged for the Phase I and II ESAs *and* attorneys' fees *and* remediation amounted to approximately $170,000, with approximately only $30,000 of the total going towards "remediation", which in

fact, only involved the federally-mandated closure of the cesspools.  See Oakland Aff. ¶ 30.  These additional expenses are actual damages which HMC suffered as a result of the disparaging statements made by BV about the condition of the property.

## V.    CONCLUSION

Based on the foregoing, this Court should deny Defendant's Motion for Partial Summary Judgment As to Injurious Falsehood/Slander of Title/Trade Libel, and grant Plaintiffs' Countermotion for Partial Summary Judgment regarding the same.

DATED: Honolulu, Hawai'i, July 19, 2010.

/s/ REX Y. FUJICHAKU
MARGERY S. BRONSTER
REX Y. FUJICHAKU
MARGUERITE S. NOZAKI

Attorneys for Plaintiffs
HAWAII MOTORSPORTS
INVESTMENT, INC. and
HAWAII MOTORSPORTS CENTER
LIMITED PARTNERS