IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HAWAII MOTORSPORTS INVESTMENT, INC., a Hawaii corporation, and HAWAII MOTORSPORTS CENTER LIMITED PARTNERS, | ) ) ) ) ) | CIV. NO. 09-00304 SOM/BMK<br><br>ORDER GRANTING DEFENDANT'S MOTIONS (NOS. 115, 117, 119) FOR SUMMARY JUDGMENT |
|        Plaintiffs, | ) ) ) | |
|    vs. | ) ) | |
| CLAYTON GROUP SERVICES, INC., formerly known as CLAYTON ENVIRONMENTAL ENGINEERING and CLAYTON ENVIRONMENTAL CONSULTANTS, INC., now known as BUREAU VERITAS NORTH AMERICA, INC., a Delaware corporation doing business in Hawaii; DOES 1-10, | ) ) ) ) ) ) ) ) ) ) | |
|        Defendants. | ) ) ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANT'S MOTIONS
(NOS. 115, 117, 119) FOR SUMMARY JUDGMENT

I.        INTRODUCTION.

        This case concerns a complex real property transaction

involving land owned by Campbell Estate and leased to Plaintiff

Hawaii Motorsports Center Limited Partners ("HMC"), which sought

to purchase the fee simple interest in the property, then sell it

to Irongate Wilshire, LLC ("Irongate").  Defendant Bureau Veritas

North America, Inc. ("BV"), was retained by Irongate to prepare

an environmental report concerning the property.  HMC and

Plaintiff Hawaii Motorsports Investment, Inc. ("HMI"), say that

BV harmed them by preparing an inaccurate report.  This court

concludes that HMC asserts no sustainable claim against BV.  This

court therefore grants BV summary judgment on the remaining

claims.

II.      BACKGROUND.

        The Estate of James Campbell owned land in Kapolei,

Hawaii, on which the Hawaii Raceway Park is located.  Michael T.

Oakland Decl. ¶ 3, attached to HMC's Concise Statement in

Opposition to BV's Motion for Summary Judgment on Second Cause of

Action (Docket No. 130).  Campbell Estate began leasing the park

to HMC or its predecessor(s) in 1988, id. ¶ 5, or in 1990, see

Oakland Decl. ¶ 5, attached to HMC's Concise Statement in

Opposition to BV's Motions for Summary Judgment (Docket No. 146).

        In 2005, HMC agreed to buy the fee simple interest in

the property from Campbell Estate for about $13 million.  Id.

¶¶ 7, 9.  HMC had to deposit with escrow an irrevocable letter of

credit by November 2005.  Ex. D at 23, attached to BV's Motion

for Summary Judgment as to Injurious Falsehood (Docket No. 115)

(HMC's response to Interrogatory No. 21 stating that Campbell

Estate gave HMC until November 15, 2005, to obtain a letter of

credit).  HMC's rights under its purchase agreement with Campbell

Estate were "personal to it" and could "not be assigned" except

in two circumstances.  Ex. D at 13, attached to BV's Motion for

Summary Judgment on Second Cause of Action (Docket No. 95).  "HMC

acknowledge[d] that prior to execution of this Agreement, the principals of HMC had the opportunity [to] and did conduct tests and inspections . . . including non-invasive environmental and soil studies." Id. at 4.

HMC sought third-party "financing or partnerships" to assist in obtaining that letter of credit. Oakland Decl. ¶ 11, attached to HMC's Concise Statement (Docket No. 146). HMC contacted Lokahi Ventures, LLC ("Lokahi"), in July 2005. Id. ¶ 12. HMC planned to buy the property from Campbell Estate, then to sell it to Lokahi for $27 million "as is" and "with all faults." Ex. 1 at 14, 20, attached to HMC's Concise Statement (Docket No. 146). Lokahi could, at its "sole cost and expense," perform Phase I and Phase II environmental assessments. Id. at 17. This agreement was never finalized.

HMC then contacted Irongate in early October 2005. Enomoto Decl. ¶ 9. HMC sought to assign its rights in the property to Irongate. On October 7, 2005, Irongate outlined the terms and conditions under which it would be willing to buy the property from HMC. Ex. 2 at 3, attached to HMC's Concise Statement in Opposition to BV's Motion for Summary Judgment on Second Cause of Action (Docket No. 130). Irongate said it was willing to buy the property for about $22 million, assuming it had 25 days to conduct due diligence, the "related costs and expenses" of which it would pay. Id. at 2. These terms were not

agreed upon.

Irongate sent HMC a new offer before October 19, 2005. Shortly after October 19, HMC accepted the offer.  Under this agreement, HMC had to ask Campbell Estate if HMC could assign its rights to Irongate.  Irongate offered to buy the property for $20 million, "$13,200,000 to Campbell as consideration for the fee simple to the Property ('Fee') and $7,100,000 to HMC as consideration for the leasehold and improvements ('Leasehold')." Ex. 2, attached to HMC's Concise Statement (Docket No. 146).  HMC was to assist Irongate with its due diligence process by "providing [Irongate with] all reports, studies, title information and the like received by HMC."  Id.  Irongate could withdraw from the agreement at any time.  Id.

While Irongate's offer was outstanding, Irongate contacted BV about preparing a Phase I environmental assessment of the property.  On October 18, 2005, BV sent Irongate[1] a proposal to conduct a Phase I environmental assessment.  Ex. B, attached to BV's Motions for Summary Judgment (Docket Nos. 115,

---

[1]Allegedly in error, BV addressed its communications to Irongate AZREP BW, LLC, an Irongate special purpose entity involved in developing the Waikiki Beach Walk, a property unrelated to the Hawaii Raceway Park property.  Irongate AZREP had no involvement with the purchase of the Hawaii Raceway Park property.  Irongate says that it "did not remember" if it told BV that BV was addressing its communications to the wrong Irongate entity, but that the reference to Irongate AZREP "was just a misprint."  Ex. E at 55, attached to BV's Motion for Summary Judgment on Second Cause of Action (Docket No. 95).

117, 119).  BV proposed to "[i]nterview key site personnel regarding current and previous uses of the property" and to use "[a]ppropriate industry standards, in accordance with innocent landowner defense opportunities available to purchasers, sellers, and lenders" when making the assessment.  Id. at 1-2.  Irongate was to use the report "to assess environmental conditions and potential environmental liabilities, if any, associated with the property."  Id.  Additionally, the proposed terms and conditions stated that Irongate could ask BV "to undertake services or work for the benefit of [Irongate] involving the presence or potential presence of hazardous substances."  Id. at 5.  BV promised to provide oral findings by October 27, 2005, if Irongate accepted BV's proposal by October 19, 2005.

Irongate promptly told BV to start work.

Within days of starting its assessment, BV orally reported to Irongate that the property had environmental problems.  Ford Tr. at 119-121, 127.  By October 21, 2005, Irongate had been informed by BV that it would be costly to fix the environmental problems.  Id.; Ex. 6, attached to HMC's Concise Statement (Docket No. 130).  BV told Irongate that the cost of remediating the property ranged from $200,000 to $4 million, with a time frame of 6 to 18 months.  Ex. 8, attached to HMC's Concise Statement (Docket No. 146).  With this information in hand, Irongate was concerned about whether the remediation

would affect its future plan to sell the land by individual lots. Id.  Irongate stated that it had to make clear to Tom Enomoto, a shareholder of HMC's general partner, "2nite that this is HIS RISK."  Id.

On or about October 25, 2005, Irongate informed Enomoto about BV's "finding about the environmental condition of Property and [BV's] remediation figures."  Enomoto Decl. ¶ 16, attached to HMC's Concise Statement (Docket No. 146).  Michael Oakland, the president of HMC's general partner, was not correspondingly informed of the cost.  In fact, neither Enomoto nor Irongate informed Oakland of the potential cost of remediation.  Ex. H, attached to BV's Reply in Support of its Motion for Partial Summary Judgment as to Injurious Falsehood (Docket No. 153) (Oakland Deposition at 167 at which Oakland responds "yeah" to the question, "As to the range of costs, the two to 400 thousand most likely case, three to four million worst case, this is the range that you discovered for the first time after the litigation was initiated?").

In mid-October, Campbell Estate told HMC that, for reasons relating to Campbell Estate's tax considerations, any sale had to result in HMC's having an ownership interest.  This meant that HMC could not simply assign its rights directly to Irongate.  To address this circumstance, Irongate and HMC signed a letter of intent to form a joint venture to purchase the

property.   On October 26, 2005, Irongate and HMC agreed that Irongate, or an Irongate special purpose entity, would contribute $13,200,000 using a letter of credit in favor of Campbell Estate. Ex. 8, attached to HMC's Concise Statement (Docket No. 130). HMC, instead of receiving $7 million, would receive four payments of $250,000 each, subject to certain conditions.   In return for Irongate's payments, HMC would assign its interest in the property to the joint venture.   Id. at 2.

The agreement was finalized on November 1, 2005.   On November 1, Irongate Hawaii Raceway Investors, LLC, a special entity of Irongate Wilshire, LLC's, entered into an agreement with HMC to buy the Campbell Estate property.   HMC assigned its rights in the Acquisition Agreement to HMC Irongate Hawaii Raceway Investors, LLC, the joint venture created for the sale. HMC Irongate Hawaii Raceway Investors, LLC, was to make four payments to HMC of $250,000 each, subject to certain conditions. Ex. 11, attached to HMC's Concise Statement (Docket No. 130).

On October 31, 2005 (a day before the agreement was finalized), BV sent the following email to Irongate:

> As a follow up to our telephone conversation last week, the following are our preliminary cost estimates for likely and worst case remediation of the Hawaii Raceway property.
>
> Likely Scenario:        $200K
> Bad Case:               $1 to 2 Million
> Extreme Worst Case:     $4 Million

Ex. 9, attached to HMC's Concise Statement (Docket No. 146).

On November 4, 2005, BV emailed a copy of its Phase I report to Irongate.  According to the report, the property had many environmental problems.  Ex. C at v-vii, 22-25, attached to BV's Motion for Summary Judgment as to Injurious Falsehood (Docket No. 115).

On November 16, 2005, BV emailed a proposal for a Phase II environmental assessment to "HMC Irongate Hawaii Raceway Investors LLC c/o Mr. Joshua Crane, Member," stating that the "purpose of this project is to analyze soil for indications of chemical impact resulting from historical and current uses of the subject property."  Ex. 6, attached to HMC's Concise Statement (Docket No. 146).  The Phase II assessment would cost $95,000, with additional costs ranging from $150,000 to 300,000 to take care of certain environmental problems.  Finally, BV stated, "[BV] will perform this project under previously negotiated terms and condition by and between [BV] and HMC Irongate Hawaii Raceway Investors LLC."[2]  Id.

Although BV addressed its Phase II proposal to the joint venture, HMC did not receive the proposal until November 22, 2005, when Irongate gave BV's Phase II proposal to HMC.

_____

[2]The reference to the joint venture appears to be in error. The previously negotiated terms and conditions were negotiated between Irongate and BV in September 2005, before the joint venture came into being.  Vora Decl. ¶ 2, attached to BV's Motion for Summary Judgment on Second Cause of Action (Docket No. 95).

8

According to HMC, the report "scared the shit out of Irongate [and HMC had] to start from here [in analyzing what happened]."

    Ex. 6, attached to Plaintiff's Concise Statement (Docket No. 146).

    On July 14, 2006, HMC Irongate Hawaii Raceway Investors, LLC, received title to the property.

    In connection with this case, HMC had an environmental engineer prepare a report about BV's report.  The engineer opined that the majority of BV's recommendations were inaccurate, stating, "Having failed to complete the minimum level of research required during Phase 1, [BV] should have recommended further record reviews and interviews [instead of recommending] a Phase II ESA."  Douglas Hazelwood Decl. ¶ 22.  He said that BV's remediation cost estimate of $200,000 to $4 million was "entirely lacking in credibility or reliability and should be considered a guess."  Id. ¶ 26.

    HMC says that BV was professionally negligent (Count I), made negligent misrepresentations (Count III), tortiously interfered with HMC's prospective business advantage (Count IV), and slandered the title and quality of the property (Count V). BV moves for summary judgment on all claims.

III.    STANDARD OF REVIEW.

    Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006). A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987. "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987. This means that the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

IV.    ANALYSIS.

A.       Professional Negligence (Count 1)

HMC argues that BV negligently prepared its environmental report.  HMC says that, as a result of BV's negligence, Irongate was unwilling to pay HMC $7 million for the property, instead agreeing to pay, at most, $1 million.  This court agrees with BV that HMC fails to establish professional negligence.

A negligence claim requires:

1.  A duty or obligation, recognized by the law, requiring the defendant to conform to a

11

certain standard of conduct, for the
protection of others against unreasonable
risks;

2.  A failure on the defendant's part to
conform to the standard required: a breach of
the duty;

3.  A reasonably close causal connection
between the conduct and the resulting injury
and;

4.  Actual loss or damage resulting to the
interests of another.

Tseu ex rel. Hobbs v. Jeyte, 88 Haw. 85, 91, 962 P.2d 344, 360

(1998) (citations and brackets omitted); Kaho'ohanohano v. Dep't

of Human Servs, 117 Haw. 262, 285, 178 P.3d 538, 561 (2008)

(citing Tseu).

HMC argues that BV owed a duty arising from the

"special relationship" between an environmental consultant and a

party that may have seen the environmental report prepared by the

environmental consultant.  This court identifies no duty owed by

BV to HMC.

It is a "basic principle that a negligence action lies

only where there is a duty owed by the defendant to the

plaintiff."  Birmingham v. Fodor's Travel Publ'ns, Inc., 73 Haw.

359, 366, 833 P.2d 70, 74 (1992).  The existence of a duty is

entirely a question of law.  Id.  A court considers several

factors in determining whether to impose a duty:

whether a special relationship exists, the
foreseeability of harm to the injured party,

12

> the degree of certainty that the injured
> party suffered injury, the closeness of the
> connection between the defendants' conduct
> and the injury suffered, the moral blame
> attached to the defendants, the policy of
> preventing harm, the extent of the burden to
> the defendants and consequences to the
> community of imposing a duty to exercise care
> with resulting liability for breach, and the
> availability, cost, and prevalence of
> insurance for the risk involved.

Blair v. Ing, 95 Haw. 247, 260, 21 P.3d 452, 465 (2001) (citation and periods omitted).

With respect to the first factor, there is no evidence of a special relationship between HMC and BV. HMC had no contract with BV. HMC was not an intended third-party beneficiary of the contract between HMC and Irongate. There is no evidence that BV intended the report, information in it, or its estimates as to remediation to be given to HMC.

In arguing that a special relationship exists, HMC cites to cases from other districts. However, in many of these cases, the allegedly negligent party had a contract with the plaintiff. See Neumann v. Carlson Environmental, Inc., 429 F. Supp. 2d 946 (N.D. Ill. 2006) (the plaintiffs contracted with Carlson for an environmental report and relied on the report when buying property, only to discover when they tried to sell the property that Carlson's original report allegedly contained misrepresentations); Green Hills LLC v. Aaron Steit, Inc., 361 F. Supp. 2d 81, 90 (E.D.N.Y. 2005) (recognizing that Green Hills had

contracted with the CEI, an environmental consulting company, for CEI to prepare an environmental report and had relied on that report when buying property, learning later that the report was faulty and that the property had environmental problems that Green Hills had to pay to fix).

Finally, <u>Jacboson v. Environmental Risk Limited</u>, 1996 WL 168086 (Conn. Super. Mar. 4, 1996), on which HMC heavily relies, actually supports this court's holding that there is no "special relationship" between HMC and BV.  In that case, the plaintiffs, sellers of real property, hired Preferred Seat Manufacturing Company ("Preferred") to prepare an environmental report.  Preferred then hired Environmental Risk Limited ("Environmental Risk") to perform the work.  The plaintiffs sued Environmental Risk, arguing that its negligent and inaccurate report forced the plaintiffs to reduce the price for the property.  The court held that there was no "special relationship" between the plaintiffs and Environmental Risk.  <u>Id.</u> at *3.  While the court held that, under Connecticut law, a special relationship was not necessary for a negligent misrepresentation claim, the court nonetheless held that there was no evidence that Environmental Risk and Preferred had intended an obligation to run from Environmental Risk to the plaintiffs.  <u>Id.</u>  Similarly, there is no "special relationship" between BV and HMC giving rise to the duty HMC relies on in Count

14

1.

        With respect to the second factor, foreseeability of

harm, it was not foreseeable that HMC would be harmed by BV's

information.  Foreseeability in this context is a question of

law, not of fact.  <u>Pulawa v. GTE Hawaiian Tel.</u>, 112 Haw. 3, 14,

143 P.3d 1205, 1216 (2006) ("[T]he issue of foreseeability in the

context of duty is a question of law for the court to resolve.").

Even if foreseeability were an issue of fact, the facts before

this court establish that such harm to HMC was not foreseeable.

In May 2005, HMC obtained the right to buy Campbell Estate's

property.  After that, HMC had many months to find financing,

form an agreement, and, if it so desired, hire a consultant to

prepare an environmental assessment.  Having been the lessee on

the property for some time, HMC had ample opportunity to discover

on its own or through retaining specialists for itself what the

state of the property was.  Under these circumstances, HMC had no

reason to be affected by inaccurate information about

environmental conditions on the property, and BV could not have

foreseen any such impact on HMC.

        As to the degree of certainty that HMC suffered harm

and the closeness of the conduct and the injury suffered, this

court concludes that it is, at best, unclear whether HMC suffered

any injury because of BV's allegedly faulty information.  HMC

says it was injured because Irongate reduced the price it was

willing to pay for the property.  However, Irongate initially

offered to pay HMC $7 million for the property, under the express

condition that Irongate could withdraw from that offer at any

time.  Additionally, the change in price flowed from the

agreement by HMC and Irongate to form an entirely new

relationship (a joint venture).  An HMC member stated that the

reduction in price and the new relationship were "more a matter

of moving it to a deal structure where we could potentially get a

lot of profit if things went really well.  So it went from a

purchase to a substantial participation deal."  Ex. G at 193,

attached to BV's Reply (Docket No. 153).  HMC agreed to form the

joint venture as the time for HMC to finalize a deal with

Campbell Estate neared an end, with Campbell Estate declining to

agree that HMC could assign its interest in the property to

Irongate.  See Ex. 7, attached to HMC's Concise Statement (Docket

No. 130).  It is, in short, unclear that Irongate would have paid

$7 million but for BV's actions.

        With respect to any moral blame and any policy of

preventing harm, this court concludes that there is no evidence

that BV is immoral or blameworthy, or that imposing a duty would

prevent any harm.  HMC could have easily countered any adverse

report by hiring its own environmental consultant.  Indeed, that

would have been prudent if HMC lacked independent knowledge of

the status of the property it had occupied for so long.

Finally, with respect to the consequences to the community of imposing a duty to exercise care and any resulting liability for a breach of duty, as well as the availability, cost, and prevalence of insurance for the risk involved, this court concludes that imposing such a duty would create additional burdens for the community. If a consultant may be liable to a third party that the consultant never intended to benefit, then that consultant will surely increase the cost of any assessment to cover the risk and the likely cost of greater insurance.

Admittedly, not every factor clearly weighs against the imposition of a duty here, but, on balance, the factors weigh against the court's imposition of any duty running from BV to HMC. As there is no independent duty owed by BV to HMC, there can be no breach of that duty or causation. This court enters summary judgment for BV on HMC's negligence claim.

B.      Negligent Misrepresentation (Count III)

Even if there is no independent duty running from BV to HMC, HMC argues that BV can be liable for having negligently misrepresented the environmental condition of the property and the cost of remediation. This court disagrees with HMC.

As the tort of negligent misrepresentation has developed, Hawaii courts have, over time, limited the scope of liability for negligent misrepresentation. In Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Limited., 115 Haw. 201, 228, 166 P.3d 961, 988 (2007), the Hawaii Supreme Court, while noting that

17

it has adopted the Restatement (Second) of Torts § 552 for

negligent misrepresentation, intentionally quoted only part of

the language in the Restatement about the scope of liability:

> One who in the course of his business or
> profession supplies information for the
> guidance of others in their business
> transactions is subject to liability for harm
> caused to them by their reliance upon the
> information if
>
>> (a) he fails to exercise that care
>> and competence in obtaining and
>> communicating the information which
>> its recipient is justified in
>> expecting, and
>>
>> (b) the harm is suffered
>>
>>> (i) by the person or one
>>> of the class of persons
>>> for whose guidance the
>>> information was supplied,
>>> and
>>>
>>> (ii) because of his
>>> justifiable reliance upon
>>> it in a transaction in
>>> which it was intended to
>>> influence his conduct or
>>> in a transaction
>>> substantially identical
>>> therewith.

Id. at 228-39, 988-89.

Laeroc tracks Hawaii Supreme Court decisions holding

that a plaintiff cannot maintain a negligent misrepresentation

claim if the plaintiff was merely an incidental, not an intended,

beneficiary of a contract.  See Blair v. Ing, 95 Haw. 247, 252,

21 P.3d 452, 457 (2001); see also Blair II, 98 Haw. 327, 328, 31

P.3d 184, 185 (2001).  As a  recent Hawaii appellate case

explains:

> In <u>Blair I</u>, Joan Hughes (Hughes) and her
> husband, Lloyd Hughes (Lloyd), were trustees
> of a revocable living trust agreement of
> which their daughters (the plaintiffs) were
> the sole, named residual beneficiaries.  <u>Id.</u>
> at 250-51, 21 P.3d at 455-56.  When Lloyd
> died, Joan retained a certified public
> accountant (the CPA) to prepare the estate
> tax forms.  <u>Id.</u> at 251, 21 P.3d at 456.  When
> Joan died, the plaintiffs became successor
> co-trustees of the Hughes Trust.  <u>Id.</u>  The
> plaintiffs learned from various attorneys
> that the tax return prepared by the CPA
> contained several costly errors and
> omissions.  <u>Id.</u>  The plaintiffs filed claims
> against the CPA for professional malpractice
> and breach of implied contract, alleging that
> the CPA had breached his duty to them as
> intended third-party beneficiaries to the
> Hughes Trust.  <u>Id.</u>  The Circuit Court of the
> Second Circuit dismissed the claim against
> the CPA, finding that the requirements of
> negligent misrepresentation had not been met
> because the plaintiffs were merely incidental
> beneficiaries of the Hughes Trust.  <u>Id.</u> at
> 252, 21 P.3d at 457.  The plaintiffs
> appealed, and the Hawaiʻi Supreme Court
> upheld the Second Circuit Court's ruling.

<u>Combs v. Case Bigelow & Lombardi</u>, 122 Haw. 58, 222 P.3d 465, *18,

(Haw. Ct. App. Jan 27, 2010).  In <u>Combs</u>, the court held that the

plaintiffs' negligent misrepresentation claim failed because the

defendants (a company's attorneys), owed no duty to incidental

beneficiaries (shareholders of the company).  <u>Id.</u> at *2, *6.

In an older case, <u>City Express, Inc. v. Express</u>

<u>Partners</u>, 87 Haw. 466, 469, 959 P.2d 836, 839 (1998), the Hawaii

Supreme Court had also quoted section 552 of the Restatement

(Second) of Torts for the proposition that liability for negligent misrepresentation is limited to the loss suffered only by certain persons:

> (a) by the person or one of a limited group of persons for whose benefit and guidance [the supplier] intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the supplier] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Similarly, in <u>Kohala Agriculture v. Deloitte & Touche</u>, 86 Haw. 301, 323, 949 P.2d 141, 163 (1997), the court noted that the supplier of information owed a duty to those persons for whose benefit and guidance information had been supplied.  The court relied on the statement in comment h to section 552 of the Restatement (Second) of Torts that "[i]t is enough . . . that the maker of the representation knows that his [or her] recipient intends to transmit the information to [such persons]."  <u>Id.</u> at 323, 949 P.2d at 163.  However, "such persons" must still be persons for whose benefit and guidance the information is supplied, meaning that mere knowledge by the maker of a representation that the representation will be transmitted, cannot, without an intent to guide or benefit the recipient of the transmission, give rise to liability.  Indeed, "It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of

action in reliance upon it, on the part of anyone to whom it may be repeated."   Restatement (Second) Torts § 552 comment h.

This court reads these cases and section 552 of the Restatement (Second) of Torts as providing for BV to be liable only to persons BV intended to benefit or to persons that BV knew Irongate intended to benefit when Irongate transmitted BV's information to such persons.   This construction is consistent with the grammar of section 552 of the Restatement, in which, as quoted in City Express, the words "intends" and "knows" are parallel.   This reading also is the only construction that comports with the Blair decisions and Combs.   At the hearing on the present motions, the parties agreed with this court's construction of Hawaii law.

There is no evidence that BV intended to benefit HMC. This court, in an earlier order, concluded that there is no evidence that BV intended HMC to benefit from BV's report or from BV's estimates of the cost of remediation.   See Hawaii Motorsports Inv., Inc. v. Clayton Group Servs., 2010 WL 2640106, *5 (D. Haw. June 29, 2010) (holding that HMC presented no evidence that it was an intended beneficiary of the BV-Irongate contract).   BV was engaged to perform an environmental assessment solely by Irongate and not at the direction of or for the benefit of HMC.   Put simply, there is no evidence that BV intended its report to benefit anyone other than Irongate.   Indeed, there is no evidence that BV itself ever intended to transmit its report

21

directly to HMC.   BV gave its report to Irongate only after Irongate and HMC had decided to form a joint venture and had agreed on the reduced price.   There is no evidence that HMC saw the physical report before then.[3]   At most, therefore, any misrepresentation at issue must have been restricted to BV's oral description of environmental problems and BV's estimates for the cost of remediation.

The court turns now to the issue of whether BV may be liable to HMC based on any knowledge on BV's part that Irongate intended to supply BV's conclusions about the property or BV's cost estimates to HMC for HMC's benefit.   During the time Irongate was negotiating with HMC and finalizing the acquisition, BV was communicating with Irongate via email and phone about the cost of fixing environmental problems.   BV planned to interview "key site personnel" and conduct an "onsite walkthrough inspection" of the property.   Toward that end, BV contacted HMC to conduct a site inspection of the property.   Having talked with HMC about the environmental condition of the property, BV likely

---

[3]There is also no evidence that HMC saw BV's draft summary of the report, dated November 3, 2005, before the formation of the joint venture.   In a previous declaration, an HMC member stated that HMC did not receive a copy of the draft executive summary until after the joint venture was formed.   Enomoto Decl. ¶ 15 (Docket No. 12-2).   That member then clarified that he did not remember having seen the summary before November 3, 2005, by which date the joint venture had already been formed.   Ex. G at 155, attached to BV's Reply (Docket No. 153).   HMC's other member stated that he did not remember ever having read either the final report or the draft report.   Ex. H at 127, attached to BV's Reply (Docket No. 153).

anticipated that BV's conclusions would be transmitted to HMC. However, there is no evidence that BV knew or had reason to expect that Irongate or anyone else intended to benefit HMC by sharing BV's conclusions or estimates with HMC.  In the absence of such evidence, HMC cannot meet its burden of showing that BV is liable to HMC.

Even if there were evidence creating a factual question as to whether BV knew that Irongate would transmit information to HMC for HMC's benefit, the negligent misrepresentation claim would fail.  That is because there is no evidence that HMC reasonably relied on any such information.

A negligent misrepresentation claim requires reliance by the recipient on the misrepresentation.  Blair v. Ing, 95 Haw. 247, 269, 21 P.3d 452, 474 (2001) (citations omitted).  If the alleged misrepresentations are BV's oral findings and BV's estimates as to the cost of remediation, the court finds no reliance by HMC.

To the extent BV's oral findings about the environmental condition of the property are at issue, HMC could not have reasonably relied on those conclusions, as HMC thought all along that BV's conclusions were false and knew the true environmental condition of the property.  For example, a member of HMC stated that BV had allegedly inaccurately stated that there were abandoned cars and a salvage area on the property. Ex. H at 33, attached to BV's Reply (Docket No. 153).  He knew

23

that there "never was" a salvage yard or abandoned cars.  Id.  Of
course, if HMC knew that those conditions had never existed, it
could not have relied on BV's statements to the contrary.
Additionally, HMC explained how it came to have extensive
knowledge about the environmental condition of the property:

> [I] operated the facility for the past 18
> years, and [went] through a number of
> situations, both as zoning goes, and as far
> as the Levine Fricke Report. . . .  [I was]
> involved in correcting and staying current
> with the Department of Health regulations.
> When it comes to anonymous complaints [about
> the property] I was fairly on top of, fairly
> aware of the potential that we had for
> contaminations, since we dealt specifically
> all the time in hazardous materials. . . .
> We were around and involved in hazards all
> the time, consistently.  We are using race
> fuels, nitromethane, and alcohols, oils;
> there is a potential for those hazards to
> exist. . . .  I felt that I was fairly
> knowledgeable on the property.

Ex. H at 41, attached to BV's Reply (Docket No. 153).

The other HMC member stated that "although HMC
disagreed with the contents of [BV's] Draft Executive Summary HMC
felt compelled to enter into the new agreement."  Ex. G at 196,
attached to BV's Reply (Docket No. 153).  When asked, "Why did
HMC feel compelled if it disagreed with [BV's] findings?"  The
member answered, "It was a squeeze play.  We were--time had run
out.  Left us no choice."  Id. at 196.

To the extent the cost estimates are at issue, there is
no evidence that HMC relied on them, much less even knew about
them.  One member of HMC stated that he never knew about BV's

cost estimates until after litigation had been filed.  Ex. H, attached to BV's Reply (Docket No. 153).  The other member stated that "there was no time" to hire an environmental consultant after HMC learned about BV's cost estimates.  Ex. G at 182, attached to BV's Reply (Docket No. 153).

Consistent with this evidence, HMC's attorney repeatedly stated at the hearing on the present motions that HMC believed all along that BV's information was inaccurate or false. If HMC believed that BV's conclusions and estimates were inaccurate, then HMC could not have reasonably relied on those conclusions and estimates.  See Schmidt v. Fidelity Nat'l Title Ins. Co., 2008 WL 2511773, *8 (D. Haw. June 24, 2008) (holding that, because the plaintiff knew the falsity of the misrepresentations made by the allegedly negligent party, the plaintiff could not have relied on the negligent misrepresentations).  Indeed, another judge of this court has previously held that a plaintiff could not have reasonably relied on allegedly negligent misrepresentations made by a party with whom the plaintiff had no relationship when the plaintiff had the ability and means to discover the alleged misrepresentations. Honolulu Disposal Serv., Inc. v. American Benefit Plan Administrators, 433 F. Supp. 2d 1181, 1193 (D. Haw. 2006).

Thus, to the extent HMC says that it relied on BV's information, that reliance is unreasonable.  HMC had no relationship with BV.  HMC knew about the environmental condition

25

of the property, or HMC could have hired its own consultant from
the start.  Finally, there is no evidence that HMC relied on BV's
environmental findings and estimates before agreeing to form a
joint venture with Irongate.  Instead, BV agreed to the joint
venture because it could potentially profit from the deal, and
because it had to finalize its deal to preserve the option of
buying the property from Campbell Estate.

C.       Injurious Falsehood/Slander of Title/Trade
         Libel (Count V)

HMC says that BV is liable for publication of an
intentional falsehood, slander of HMC's title, and trade libel in
the form of allegedly false, disparaging statements about the
property.  The court finds no evidence supporting these
allegations.

The distinction between the torts of injurious
falsehood, slander of title, and trade libel is slight.  Some
courts treat statements disparaging another's business as
injurious falsehoods, while disparagement of another's product is
called "trade libel," and disparagement of another's title is
deemed "slander of title."  Kasada, Inc. v. Access Capital, Inc.,
2004 WL 2903776, *15 (S.D.N.Y. Dec. 14, 2004).  Other courts have
held that trade libel and slander of title are both types of
injurious falsehoods.  See Aetna Cas. & Sur. Co., Inc. v.
Centennial Ins. Co., 838 F.2d 346, 351 (9th Cir. 1988) (noting
that trade libel and slander of title are injurious falsehoods);

Smith v. Magnolia Lady, Inc., 925 So. 2d 898, 906 (Miss. App.
2006) (noting that injurious falsehood is a common law tort also
known as "trade libel," "commercial disparagement," and "slander
of title").   To give HMC the benefit of every doubt, the court
addresses each of the three iterations separately, assuming an
injurious falsehood is distinct from trade libel or slander of
title.

Before addressing the elements of the claims, this
court addresses three initial matters.   First, this court notes
that the parties focus on the impact of BV's report on HMC, and
on whether information in BV's report constitutes injurious
falsehood, slander of title, or trade libel claims.   However, as
this court notes above, the physical report was transmitted after
HMC had formed its agreement with Irongate and agreed to a
reduced price.[4]   The written report itself therefore could not
have interfered with any relationship.   What there is evidence
of, however, is the oral communication by BV to Irongate of BV's
findings and BV's estimated cost of remediation.   Irongate knew
of these before October 25, 2005, and the court examines whether
the estimates and any orally transmitted support for these

--------

[4]BV sent Irongate its estimate for the cost of remediating
the property on or before October 21, 2005.   Irongate told HMC
about BV's findings and cost estimates on or before October 25,
2005.   On October 26, 2005, the parties agreed to form a joint
venture.   On October 31, 2005, BV emailed Irongate its cost
estimates for the property.   On November 1, 2005, the deal was
finalized.   On November 4, 2005, BV emailed Irongate its report.

27

estimates constituted an "intentional falsehood," "slander of title," or "trade libel."

Second, to maintain these actions, a plaintiff must possess an estate or interest in the property that is allegedly disparaged. <u>Jeffrey v. Cathers</u>, 104 S.W. 3d 424, 429 (Mo. App. 2003). HMI (as distinguished from HMC) had no estate or interest in the property that was allegedly disparaged.

Accordingly, BV is granted summary judgment on HMI's claims against BV in this regard.

Third, it is not clear that a statement in the form of opinion, not fact, is actionable under these theories. At common law, a claim could be based on an injurious statement of fact or opinion, similar to the common law rule of defamation. <u>See</u> Restatement (Second) Torts § 624 comment b; Restatement (Second) Torts § 623A comment e. However, a statement in the form of opinion is no longer actionable as defamation, unless it is held to imply the existence of undisclosed defamatory facts that justify the derogatory opinion. "'Pure opinions'-opinions that do not imply facts capable of being proved true or false-are protected by the First Amendment, and are not actionable." <u>Miracle v. New Yorker Magazine</u>, 190 F. Supp. 2d 1192, 1198 (D. Haw. 2001). "A similar rule may now apply to injurious falsehood, either because the Constitution requires it or through decisions of the state courts by way of analogy to the similar tort of defamation." Restatement (Second) Torts § 623A comment

e.  "Whether this constitutional rule will apply to injurious falsehood is currently not clear."  Restatement (Second) Torts § 624 comment b.  This court does not base this ruling on the distinction between opinion or fact.

### 1.        Injurious Falsehood

Injurious falsehood generally "consist[s] of the publication of matter derogatory to the plaintiff's business in general, of a kind calculated to prevent others from dealing with him or otherwise to interfere with his relations with others to his disadvantage."  W. Techs., Inc. v. Sverdrup & Parcel, Inc., 154 Ariz. 1, 4, 738 P.2d 1318, 1321 (Ariz. Ct. App. 1986) (quotations omitted).  There is no evidence that BV published a matter derogatory to HMC's business.  BV only told Irongate about its findings and about the potential costs of remediating property that HMC had leased.  That is not a "derogatory" comment about HMC's business, which was racing, not land development.

### 2.        Slander of Title

Slander of title is "a tortious injury to property resulting from unprivileged, false, malicious publication of disparaging statements regarding the title to property owned by plaintiff, to plaintiff's damage."  Southcott v. Pioneer Title Co., 203 Cal. App. 2d 673, 676 (1962) (citations omitted).  This court does not view BV's statements about environmental problems or the need for or cost of remediation as in any way effecting the legitimacy of HMC's leasehold interest in the property at

29

issue.  BV's statements did not concern title at all.

Even if BV's statements could be said to affect HMC's
rights in the property, the slander of title claim would fail.
"To establish slander of title at common law, a plaintiff must
show falsity, malice, and special damages, i.e., that the
defendant maliciously published false statements that disparaged
a plaintiff's right in property, causing special damages." B & B
Inv. Group v. Gitler, 229 Mich. App. 1, 8, 581 N.W. 2d 17, 20
(Mich. Ct. App. 1998).  Although the existence of absence of
malice is usually a question for the jury, when "[t]he plaintiff
has had his 'inquiry into malice,' and the pleadings,
interrogatories, and uncontroverted affidavits, depositions and
exhibits, taken together, show the absence of a genuine issue as
to this material fact," a court may enter summary judgment.
Runnels v. Okamoto, 56 Haw. 1, 6, 525 P.2d 1125, 1129 (1974).

HMC does not establish that BV maliciously made any
statement.  HMC argues that BV acted with reckless disregard of
the truth because "BV put on its blinders to discovering the true
environmental condition of the Property, exaggerated its visual
observations of the Property, and intentionally communicated this
slanted version of its findings to Irongate, in order to secure
an expensive and costly Phase II assignment."  Opposition at 20
(Doc. No. 143).  However, there is no evidence that BV
intentionally exaggerated the cost of remediation, or was
reckless in stating the cost.  The property at issue had a

history of environmental problems.  BV explains its cost

estimates:

> Well, as I described earlier, we generally
> have a, you know, process of assumptions.
> Given this situation, we didn't have much
> time.  It was very preliminary numbers that
> were qualified, our client pressing us to
> give us this number.  We wanted to satisfy
> our client by, you know, his request, but
> given that we hadn't done a Phase II and we
> only had so much information at the site, you
> know, these were very, very preliminary
> numbers.

Ford tr. at 121-22, attached as Ex. 12 to HMC's Concise Statement

(Docket No. 146).  Additionally, BV let Irongate know that the

figures were based on "very preliminary information."  <u>Id.</u> at

125.  Even if BV said that it would be costly to remediate the

property for the purpose of securing future business, that does

not establish that BV acted in reckless disregard of the truth.

Not only is there no evidence that HMC "put on blinders," HMC

points to no law suggesting that, without more, that constitutes

malice.

3.        <u>Trade Libel</u>

Trade libel or disparagement is defined as "an

intentional disparagement of the quality of property, which

results in pecuniary damage."  <u>Aetna Cas. & Sur. Co., Inc. v.</u>

<u>Centennial Ins. Co.</u>, 838 F.2d 346, 351 (9th Cir. 1988).  A claim

for trade libel or disparagement requires at least "(1) a

publication; (2) which induces others not to deal with plaintiff;

and (3) special damages."  <u>Hawaiian Ins. & Guar. Co., Ltd. v.</u>

31

Blair, Ltd., 6 Haw. App. 447, 726 P.2d 1310 (Haw. App. 1986) (citing Restatement (Second) of Torts § 626 (1977)(citations and quotations omitted).  The false and disparaging statements must be "directed at . . . the goods a plaintiff sells or the character of his . . . business." Aetna, 838 F.2d at 351.

        HMC fails to establish that BV's allegedly false and disparaging statements were directed at the goods HMC sold or the character of its business.  Although Hawaii has little caselaw on this claim, California courts have held that to state a trade libel claim, the plaintiff must allege that defendant made false, injurious, or derogatory statements about a plaintiff's products or business, causing the plaintiff to suffer pecuniary damages. See E.piphany v. St. Paul Fire & Marine Ins. Co., 590 F. Supp. 2d 1244, 1258 (N.D. Cal. 2008); see also Hansen Bev. Co. v. Vital Pharm., Inc., 2010 WL 1734960, *11 (S.D. Cal. Apr. 27, 2010) (noting that a plaintiff must show that, because of the defendant's actions, the plaintiff's business suffered injury). In this case, BV made allegedly false statements about the cost of remediating property that HMC leased, not about HMC's operation of Hawaii Raceway Park.

         Not only does HMC fail to show that BV disparaged HMC's business, HMC also fails to establish the first element, the publication of a false statement.  With respect to this element, a defendant must "intentionally or by a negligent act" give a false statement "to someone other than the person whose

32

interest was affected." Blair, Ltd., 6 Haw. App. at 455 n.10, 726 P.2d at 1315 n.10.  HMC conflates the requirement of "intent or a negligent act" with the falsity of the statement.  HMC argues that a defendant may be liable for trade libel if that defendant negligently publishes a statement that the defendant should have known was false.  In other words, HMC maintains that a defendant need only have negligently published a statement and acted negligently with respect to the falsehoods in the statement.  The law does not treat the elements of trade libel so loosely.  While a party may negligently publish the statement, Restatement (Second) of Torts § 630, that party must still know that the statement is false, see Restatement (Second) Torts § 623A.  See also Restatement (Second) Torts § 623A comment d ("A principal basis for liability for injurious falsehood has been that the publisher knew that the statement was false or that he did not have the basis of knowledge or belief professed by his assertion.").  As discussed above, there is no evidence that BV knew its cost estimate was inaccurate or knew that it lacked knowledge or belief professed by its assertion.  The assertion, in fact, included BV's admission that the figures were based on "very preliminary" information, so BV was not professing to have complete knowledge.

        This court enters summary judgment for BV on this claim.

D.          Tortious Interference with Prospective
            Business Advantage (Count IV)

HMC argues that BV interfered with HMC's prospective business opportunity with Irongate.  At the hearing on these motions, HMC noted that, if there was no independent duty running from BV to HMC, then HMC would not be able to establish this claim.  As this court notes above, there is no duty in tort running from BV to HMC.  This court therefore grants BV summary judgment on this claim.

The elements of the intentional tort of tortious interference with prospective business advantage are:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

Haw. Med. Assn v. HMSA, 113 Haw. 77, 116, 148 P.3d 1179, 1218 (2006).

BV does not dispute the first element, the existence of a prospective business relationship between HMC and Irongate.

With respect to the second element, knowledge, a defendant must only have "knowledge of facts which would lead a reasonable person to believe that such interest exists" to

34

satisfy this element.  <u>HMSA</u>, 113 Haw. at 116, 148 P.3d at 1218.
The evidence is sufficient to support the inference that BV knew
that Irongate was negotiating with HMC.

Where HMC's claim begins to fall apart is with respect
to the third element, intent.  The third element "denotes
purposefully improper interference" and requires a state of mind
or motive more culpable than mere intent:

> The plaintiff must prove that the defendant
> either pursued an improper objective of
> harming the plaintiff or used wrongful means
> that caused injury in fact.  Asserting one's
> rights to maximize economic interests does
> not create an interference of ill will or
> improper purpose.

<u>Id.</u> at 116, 148 P.3d at 1218.

HMC argues that BV used wrongful means, such as
misrepresentation, when communicating the condition of the
property to Irongate.  HMC says that BV did not correctly employ
industry standards.  Even assuming (without deciding) this to be
so, this does not on its own establish intent.  If it did, then
mere sloppiness could establish intent.  That is not the law of
Hawaii.

HMC next says that BV failed to abide by the terms of
its contract with Irongate.  However, in a tortious interference
claim, the improper conduct or wrongful means "must also be more
than a mere breach of contract." <u>Kapunakea Partners v. Equilon
Enterprises LLC</u>, 679 F. Supp. 2d 1203, 1218 (D. Haw. 2009).  HMC
tries to prove that BV acted wrongfully (and therefore should be

liable in tort) by saying that BV breached its contract with

Irongate.  That is not enough:

> [I]f a court were to conclude that a breach
> of contract could satisfy the improper
> interference element of the tort of tortious
> interference with a prospective business
> advantage under Hawai'i law, it would be
> tantamount to resurrecting the tort of
> tortious breach of contract, albeit it in
> certain limited circumstances.  Given that
> the <u>Francis</u> court abolished the tort of
> tortious breach of contract, the Court
> predicts that, if presented with the
> question, the Hawai'i Supreme Court would
> hold that a breach of contract, even if done
> for improper purposes, does not without more
> give rise to improper interference for
> purposes of a tortious interference with a
> prospective business advantage claim.

<u>Id.</u>

Finally, HMC argues that fraudulent misrepresentations

are sufficient to satisfy the intent element.  However, there is

no evidence of any fraudulent misrepresentation.  Mere negligence

is not enough to state a tortious interference claim.

Accordingly, this court enters summary judgment for BV on this

claim.

V.       <u>CONCLUSION.</u>

This court grants BV summary judgment on all claims.

The Clerk of Court is ordered to enter judgment for Defendant and

to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii August 27, 2010



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Hawaii Motorsports Investment v. Clayton Group Services, 09cv304; ORDER
GRANTING DEFENDANT'S MOTIONS (NOS. 115, 117, 119) FOR SUMMARY JUDGMENT.